JAMES O'CONNOR, PLAINTIFF IN ERROR, vs. THE STATE.

1. A venire man stated on his *voire dire* that he had formed an opinion as to the guilt or innocence of the prisoner, but that such opinion was based on mere rumor; that he had not heard the witnesses or any one speak of the matter by detailing any of the facts or circumstances connected with the killing as of their own knowledge; that it would require evidence to remove the opinion so formed upon rumor, but that if taken upon the jury, he could readily and without hesitation find a verdict according to the evidence, although that verdict might be contrary to the opinion so formed on rumor. *Held*, that said juror was competent.

2. A venire man stated on his *voire dire* that "he, as Coroner of the county, held the inquest on the body of the person for whose killing the prisoner is on trial; that he heard all the evidence that was then before him, but that he had not formed or expressed an opinion as to the guilt or innocence of the prisoner at the bar." The record did not show what evidence was "then before him," or that there was any whatever pointing to the prisoner as the person

Who had committed the killing. *Held*, that said *venire man* was competent to be sworn in chief as a juror.

3. A *venire* man stated on his *voire dire* that he is related by blood to the prisoner; thinks he is not so near related as second cousin, but that he may be third cousin. *Held*, that he was not competent to be sworn as a juror.

4. "There is no provision whatever in our law for issuing a special *venire facias*." "When by reason of challenges or otherwise a sufficient number of jurors duly drawn and summoned cannot be obtained for the trial of any cause, civil or criminal, or for the execution of a writ of enquiry, the Court shall cause jurors to be summoned from the bystanders, or from the county at large, to complete the panel." These jurors need not be regularly drawn from the box, like the members of the regular panel, but they must have the same qualifications as those presented for the regular panel, that is to say, they must be free white male citizens of the United States, who are householders and inhabitants and residents of the State and county, above twenty-one years and under sixty years of age. In practice, it is not error for the Court to anticipate that the regular panel will be exhausted, and therefore in advance to order the Sheriff to summon any reasonable number of competent jurors to be present, so that they may be in readiness to be taken on the happening of the anticipated contingency.

5. The prisoner demanded that each juror, as he was tendered by the State and accepted by him, should be sworn in chief, which the Court overruled, and each juror, as he was tendered and accepted, was ordered into the box and kept under the eye of the Court until the whole twelve were chosen, and thereupon the Court ordered them to be sworn in chief, three at a time. *Held*, that this was not error. It is not error for the Court to refuse to cause the jurors to be tendered to the prisoner again separately after he has once accepted them, but it is the right of the prisoner to retract his acceptance and object to a juror at any time before he is sworn in chief.

6. It is not error for the Court to refuse to have the jury sworn "to find a verdict according *to the law* as well as the evidence in the case." The usual and proper form of oath is this: "You shall well and truly try and true deliverance make between the State of Florida and ———, the prisoner at the bar, whom you shall have in charge and a true verdict give *according to the evidence*."

7. The verdict of the jury must be recorded before they are discharged. The jury having returned into Court and having answered to their names, the Court asked them if they had agreed on their verdict; they answered they had, and handed the Court the indictment, on the back of which was written: "We, the jury, find the prisoner guilty. Charles Pratt, Foreman." The Court then said, "do you all say that the prisoner is guilty?" to which the jury assented; thereupon, on motion of the prisoner, the jury was polled, and each juror answered guilty. Thereupon the Court discharged the jury. *Held*, that this verdict was recorded within the meaning of the law.

8. When the verdict was simply "guilty," and there was but one count in the indictment, and that was for murder, although the jury under this count

might have found the prisoner guilty of manslaughter, yet having found him guilty generally, it must be taken as referring to the offence in the indictment.

9. It is not necessary that the bailiff under whose charge a jury in a capital case retires or deliberates should be sworn for that particular case. It is sufficient if he be sworn generally for the term. If neither party asks for triors in a capital case, but submit the matter to the Court, they are bound by its decision.

10. Under the naturalization act of Congress of 1802, the infant children of aliens, though born out of the United States, if dwelling within the United States at the time of the naturalization of their parents, become citizens by such naturalization, and the provisions of that act on this subject are prospective, so as to embrace the children of aliens naturalized after the passage of the act as well as the children of those who were naturalized.

11. If the evidence in a case be so conclusive that the jury could not have found any other verdict than that which they did find, the Court should not set aside such verdict on the ground of irregularity in the conduct of one or more of the jurors, unless such irregularity be gross.

This case was decided at Marianna.

Writ of error to Franklin Circuit Court.

The opinion of the Court contains a statement of the facts connected with the several points decided by the Court, the opinion giving the facts in the order in which the points are decided and sufficiently explaining the same.

*D. P. Holland* and *J. M. Gorrie* for plaintiff in error.

*W. D. Barnes,* for Attorney General, for the State.

WALKER, J., delivered the opinion of the Court.

The plaintiff in error, having been convicted and tried at the fall term 1859 of Franklin Circuit Court, on an indictment for the murder of his wife Bridget O'Conner, sued out a writ of error to this Court. The first juror called was S. K. Bull. The record states, that one of the regular panel, who, being sworn on his *voire dire,* said that he had formed an opinion as to the guilt or innocence of the prisoner, but that such opinion was based upon mere rumor; that he had not heard the witnesses, or any one, speak of the matter by

26

detailing any of the facts or circumstances connected with the killing as of their own knowledge; that it would require evidence to remove the opinion so formed upon rumor, but that, if taken upon the jury, he could readily and without hesitation find a verdict according to the evidence, although that verdict might be contrary to the opinion so formed on rumor. Counsel for prisoner moved to challenge said juror for cause, but the Court ruled that he was a competent juror. To this ruling the prisoner excepted and challenged said juror peremptorily. The Court made the same ruling in the case of the next juror called, to wit: "Francis E. Harrison, to which the prisoner also excepted and then challenged him peremptorily. These rulings of the Court constitute the ground of prisoner's first assignment of error in this Court.

Few questions have been more discussed than this one concerning the competency of jurors. We have taken much pains to sift the numerous and sometimes conflicting authorities, which the highly commendable zeal and industry of counsel in this case and our own investigations have brought to our attention, and endeavored to ascertain the true rule on this subject. We think we may adopt with safety as sound law the following extracts from 2 Graham & Waterman on New Trials, viz: Page 376.—"Jurors ought to come to the investigation free from any preconceived impression whatever. But, as this, in the present condition of society, is frequently, if not generally, impossible, the law does not require in practice quite so much strictness. It has been well remarked, that, in an agricultural community like ours, of sparse population, identical pursuits, equal station and newspapers scattered far and wide, it has always been found a matter of much delicacy and difficulty—sometimes altogether impracticable—to procure a jury entirely unaffected by rumors touching the transactions upon which they are to pass."

And again, (page 397,) Judge Breese, in Smith vs. Eames, 3 Scam. Rep., 76, expresses the idea as follows: "The human mind is so constituted that it is almost impossible, on hearing a report freely circulated in a county or neighborhood, to prevent it from coming to some conclusion on the subject; and this will always be the case while the mind continues susceptible to impressions. If such impressions become fixed and ripen into decided opinions, they will influence a man's conduct and will create, necessarily, a prejudice for or against the party towards whom they are directed and should disqualify him as a juror; but, if in obedience to the laws of his organization, his mind receives impressions from the reports he hears, which have not become opinions fixed and decided, he would not be disqualified."

"A distinction is drawn by some of the authorities between an opinion and a mere impression, it being held that the former will disqualify, but not the latter; but such a distinction seems to be rather nominal than real. An impression may be so strong as to be tantamount to an opinion, while opinions are often slight, vacillating and easily changed. It seems, therefore, that, although a juror may have formed an opinion, yet, if he has not definitively made up his mind, he is not necessarily liable to exception."—2 Dev. & Bat., 761.

"The true doctrine is, that if the juror's conceptions are not fixed and settled, nor warped by prejudice, but are only such as would naturally spring from public rumor or newspaper report, and his mind is open to the impressions it may receive on the trial, so as to be convinced according to the law and the testimony, he is not incompetent."

This Court also adopts as sound law the ruling of the Supreme Court of Mississippi, that it is not necessary to exclude a juror that he should have formed and expressed his opinion against the accused with malice or ill will, but that a

mere hypothetical opinion from rumor only, and subject to be changed by the testimony, does not disqualify. If a juror, however, has formed a fixed opinion, he ought to be excluded, though he may never have expressed that opinion. Wharton's Criminal Law, 852; State vs. Johnson, 1 Walk., 392; State vs. Hoover, *ib.*, 318.

"When the juror said he had formed and expressed an opinion from rumor only, but that his mind was free to act on the testimony, he was held competent. A juror being examined on his *voire dire*, was asked: 'Have you formed or expressed an opinion as to the guilt or innocence of the prisoner at the bar?' Answer. 'I have.' Question. 'Have you formed or expressed that opinion from common report or from the witnesses, or either of them?' Answer. 'Common report only; I have never heard any of the witnesses say anything on the subject.' Question. 'Will anything you have heard or said respecting the prisoner have any influence on your mind as a juror in the determination of this cause?' Answer. 'It will not; I feel free to decide the case according to the evidence which may be produced on the trial.' Such an individual was held to be a competent juror."—See Wharton's Criminal Law, 852, citing King vs. State, 5 Howard's Miss. Rep., 730; State vs. Johnson, 1 Walker, 392.

"The formation of an opinion by one who had heard all the testimony is a disqualification, while one who has formed a hypothetical opinion from rumor, and who at the same time declares he could render an impartial verdict, will be a competent juror. Between these extremes the qualification or disqualification must depend on the circumstances of each case."—Wheaton's Crim. Law, 853, citing Sam vs. State, 13 Smedes & Marshal, 189.

We hold that the above extracts express the true rule of law on this subject, and tested by them the ruling of the

Court below that Bull and Harrison were competent jurors was correct.

They swore that they had formed their opinion upon *mere* rumor; that it would require evidence to remove the opinion so formed on rumor, but that if taken upon the jury they could readily and without hesitation find a verdict according to the evidence, although that verdict might be contrary to the opinion so formed upon rumor.

To hold that these jurors were incompetent because they said it would require evidence to remove the opinion so formed on rumor, although they stated that if taken on the jury they could *readily and without hesitation* find a verdict according to the evidence, &c., would be to hold that no juror can be competent who has formed an opinion on mere rumor, because, if he has formed any opinion or impression, however slight, that opinion or impression must necessarily remain until removed by evidence; but as we have seen, such a ruling as that would be against law. The very thing necessary to make a juror who has formed an impression from mere rumor competent, is that his mind must be in such a condition that all slight preconceived opinions or impressions may be readily and without hesitation removed by the testimony.

The fifth assignment of error is that the Court erred in ruling Edward Carpenter as a competent juror.

Edward Carpenter, on his *voire dire*, stated that he was and is the Coroner of the county of Franklin; that as Coroner he held the inquest on the body of the person for whose killing the prisoner is on trial; that he *heard all the evidence that was then before him*, but that he had not formed or expressed an opinion as to the guilt or innocence of the prisoner at the bar.

The Court ruled that he was competent, to which ruling the prisoner excepted and challenged him peremptorily.

What the evidence "*then before him*" was, the record does

222 SUPREME COURT.

O'Connor vs. The State.—Opinion of Court.

not show, nor, indeed, that there was any evidence whatever then before him pointing to the prisoner as the party who had committed the killing. Whatever it was, it seems not to have been sufficient to induce him to *form* or *express* an opinion. The only question, therefore, is whether the simple fact that he presided as Coroner at the inquest was sufficient to disqualify him as a juror. After much investigation we have been unable to find any rule of law which would make this fact alone render him incompetent. While we rule that the Court below did not err in overruling the prisoner's motion to reject said juror, yet we may be excused for saying we think it would perhaps have been well for the Court to have excluded said juror under the power confided to it by the 11th section of the act of 1846, which is in these words, viz:

"The Court may discharge a person from serving as a juror who does not possess the requisite qualifications, or who is exempt or disqualified for such service, *or for any reasonable and proper cause, to be judged of by the Court.*"

We make this suggestion upon the ground that jurors should if possible be not only impartial, but beyond even the suspicion of partiality.

The fourth error assigned is that the Court erred in ruling James O'Conner as an incompetent juror and allowing challenge for cause on behalf of the State.

The record states that James O'Conner said on his *voire dire* that he is related by blood to the prisoner; thinks he is not so near related as second cousin, but that he may be a third cousin.

We have no difficulty in saying that the Court below did not err in this ruling. The juror was clearly of kin to the prisoner within the ninth degree. See 3 Black. Com., 363; 1 Chit. Cr. Law, 441.

The third assignment of error is that the Court erred in overruling the challenge to the array of the special venire.

The record on this point reads thus: "The regular panel being exhausted, the Sheriff proceeded to call the special venire, whereupon the prisoner challenged the array on the special venire, and alleged the following grounds: First. that it appeared that the Court had ordered a special venire to issue for eighty jurors, and such writ had issued, and that the Sheriff had only returned seventy-one jurors instead of eighty, endorsing on the special venire that not more than seventy-one jurors could be found in his county. Second. That the Sheriff had not taken or drawn the names of the jurors from the box or list of the county of Franklin from which the regular panel was taken, but that the Sheriff had gone into the county and summoned seventy-one men whom he believed were liable to jury duty, and that such drawing and summoning the jury was not according to law, the Sheriff not having obtained the jury list of the county of Franklin, which motion or challenge the Court overruled, to which ruling of the Court the prisoner excepted."

No evidence appears in the record to support the facts alleged in this motion or challenge and for aught we know the Court below may have overruled it on the ground that the facts alleged in it had not been made to appear. But taking it for granted that all the facts alleged in the motion were proven, still we think the Court did not err in overruling it.

The wise provisions of our statute of 1846, cited by counsel for the prisoner, (see Tho. Dig., 345,) as to the manner of making out the list and drawing and summoning the jury, relates exclusively to the regular panel, but, as it was foreseen that the regular panel would be frequently exhausted, as was the case here, the 12th section of said act of 1846, provided for that exigency in these words, to wit:

"Sec. 12. When by reason of challenges or otherwise a sufficient number of jurors, *duly drawn and summoned*, cannot be obtained for the trial of any cause, civil or criminal,

224             SUPREME COURT.

O'Connor vs. The State.—Opinion of Court.

or for the execution of a writ of enquiry, the Court shall cause jurors to be summoned from *the bystanders or from the county at large*, to complete the panel, who shall possess the same qualifications as prescribed in the provisions of this act."

This section draws a plain distinction between jurors "duly drawn and summoned" and jurors taken from "the bystanders or from the county at large." The one class is not to be resorted to until the other has been exhausted. The "qualifications" of the bystanders or jurors taken from the county at large are to be the same as those of the jurors who have been "duly drawn and summoned;" that is to say, they must be householders, &c.

There is no provision whatever, in our law for issuing a special *venire facias*. The Court might, if it thought proper, (and this would be a literal compliance with the law,) have refused to issue a special *venire facias* until the regular panel was exhausted, and then have "caused jurors to be summoned from the bystanders or the county at large" to complete the panel *instanter*. If this had been done the prisoner would have had little or no opportunity to look over the list and select his jurors, and the Court and the jurors already taken from the regular panel, would have had to wait till the Sheriff could get jurors from the bystanders, (not always the best men to make jurors in an important case) or from the county at large. To prevent these difficulties the Court anticipated that the regular panel would be exhausted, and therefore gave an order to the Sheriff to summon eighty men to be present, so that they might be in readiness to be taken if the regular panel should be exhausted.

The Sheriff obeyed this order, as far as he was able, by summoning seventy-one persons, returning on his writ that not more than seventy-one jurors could be found in his county. This was certainly nothing of which the prisoner

could complain. The effect of the whole proceeding was to give him, in advance, a list of the names from amongst which the jury would be taken.

The English law on this subject is very much the same as our statute.—In 2 Black. Com., 365, it is stated thus:

" If by means of challenges or other cause, a sufficient number of unexceptionable jurors doth not appear at the trial, either party may pray a *tales*. A *tales* is a supply of *such* men as are summoned on the first panel, in order to make up the deficiency. For this purpose a writ of *decem tales*, *octo tales*, and the like, was used to be issued at common law, and must be still so done at a trial at bar, if the jurors make default. But at the assizes or *nisi prius* by virtue of the statute of 35 Hen., VIII. C., 6, and other subsequent statutes, the Judge is empowered at the prayer of either party to amend a *tales de circumstantibus* of persons present in Court, to be joined to the other jurors to try the cause, who are liable, however, to the same challenges as the principal jurors. This is usually done till the legal number of twelve be completed, in which patriarchal and apostolical number, Sir Edward Coke hath discovered abundance of mystery."

The practice of the English Courts under this law is substantially the same as that pursued by the Court below, as will be seen by reference to the case of Rex vs. Dolby, 9 Eng. Com. Law R., 56.

The second ground of error assigned is, that the Court erred in denying prisoner's demand to have the juror John B. Elton sworn in chief, when he was tendered and accepted.

The 6th assignment is that " the Court erred in refusing that the jurors should be sworn, as each juror was tendered and accepted."

The 8th assignment is that the Court erred in swearing the jury three at a time.

27

We will consider the 2nd, 6th and 8th assignments together.

It appears from the record that "the prisoner demanded that each juror, as he was tendered by the State, and accepted by him, should be sworn in chief, which the Court overruled; and each juror, as he was tendered and accepted, was ordered into the box, &c., kept under the eye of the Court, until the whole twelve were chosen, and thereupon the Court ordered them to be sworn in chief," three at a time.

We think there was no error in this. It was but mere matter of form, not violation of any principle of law, or working any possible damage or injustice to the prisoner. We find by reference to Robinson's Forms, page 214, that the form of proceeding is as follows: " The Sheriff calls the first named on the panel, and upon his coming into Court, the Clerks bids him look upon the prisoner; which being done, the Clerk asks the prisoner: "Are you willing to be tried by this man?" If the prisoner answers "No," the Clerk tells the venire man he may retire, and makes a memorandum of his name, as he will afterwards do of any others, who may be challenged peremptorily. But if the prisoner answers " Yes," the Clerk tells the venire man to sit in the jury box. After three others have been elected, the *four are called to the book* by the Clerk who administers to them the oath."

The usual practice in this State, in trial for felony, has been to swear the jury, only *one* at a time; and for the sake of uniformity, it would be well if that form were adhered to, unless some peculiar circumstances should exist to make a departure from it proper; but we are clear that a variance from it is no ground of reversal.

The seventh assignment of error is, that "the Court erred in refusing the right of the prisoner of tendering objections

to the jury after they were chosen but before they were sworn in chief."

This assignment is based on the following extract from the record:

"The prisoner demanded that each juror, as he was tendered by the State and accepted by him, should be sworn in chief, which the Court overruled, and each juror, as he was tendered and accepted, was ordered into the box and kept under the eye of the Court until the whole twelve were chosen; thereupon the Court ordered them to be sworn in chief. The prisoner then asked that the jury should be tendered again separately to him before they were sworn, so that, if he had any objection, he might then make it, which the Court refused, and ordered the jury to be sworn three at a time, and the whole panel was sworn. To all of which rulings the prisoner excepted, the prisoner only having exhausted six of his peremptory challenges."

We have already ruled, in considering the 2d, 6th and 8th assignments, that the Court did not err in ordering the jurors into the box until the twelve (12) were chosen, and ordering them to be sworn three at a time.

We come now to consider whether the Court erred in refusing the request of the prisoner to have the jury tendered to him again *separately*, so that, if he had any objection, he might then make it. We know of no rule of law which requires the Court to tender a juror to the prisoner again after he has accepted him, and we are equally clear that it was the right of the prisoner to retract his acceptance and object to a juror *at any time* before he is sworn in chief. A different doctrine seems to prevail in Connecticut. In that State, (see Wharton's Am. Crim. Law, page 860, citing State vs. Potter, 18 Conn., 166,) "B having been called as a talesman and examined as to his bias, and no reason to except to him appearing, the counsel for the prisoner were informed by the Court that they could then challenge B per-

emptorily if they desired to do so. They declined to exercise the right, as the panel was not then full, and B was directed to take his seat as one of the jurors. After the panel was full and but six peremptory challenges had been made, the prisoner's counsel claimed the right to challenge B peremptorily. It was held, that in the absence of any reason for any peremptory challenge then, which did not exist before when the exercise of the right was declined, it was too late to challenge B peremptorily."

A strong argument in favor of this ruling in Connecticut is, that it prevents a prisoner from experimenting with the jury by declining to challenge peremptorily until a full panel is obtained, and then, when he wants to exchange a juror whom he has taken for another whom he thinks he can get, to enable him to do so. But, in *favorem vitæ*, we adopt the doctrine as laid down in Virginia, in the case of Henrick vs. Com., 5 Leigh, 708. In that case, D. Hudson being called as a juror, the prisoner elected him, but, as the juror was taking his seat and after the Sheriff called another juror, the prisoner objected to Hudson, and one of his counsel stated that the prisoner was acting under his advice in relation to his challenges, and in electing Hudson had mistaken his advice, and he insisted that the prisoner had a right to retract his election of this juror and to challenge him peremptorily. But the Court below refused to permit him now to make such peremptory challenge, and this juror was sworn and served as one of the jury. The prisoner excepted and took the case to the General Court of Virginia, which ruled as follows, viz: "We think that the Court below erred in refusing to permit the prisoner to retract his election of the juror D. Hudson and to challenge him peremptorily. Some circumstances are stated to show the reason of this decision which it is not necessary to advert to, for this Court is unanimously of opinion that the right of a prisoner to challenge any juror peremptorily is absolute at

any time before the juror is sworn, and that no circumstances can bring that right within the discretion of the Court so long as it is confined to the number of peremptory challenges allowed by law."

Holding this ruling of the General Court of Virginia as correct, we are of opinion, that if the prisoner, at any time before any juror was or jurors were sworn, had retracted his election of such juror or jurors and expressed his desire to challenge him or them, it was his right to do so until the whole of his peremptory challenges were exhausted. But the record does not show that the prisoner retracted his election of any juror or jurors and challenged him or them peremptorily, or even expressed a desire to do so. It shows only that the prisoner " asked that the jury should be tendered to him again separately before they were sworn, so that, if he had any objection, he might then make it." The prisoner did not state, (so far as we can learn from the record,) that he had any objection, or that he would make any if the jury should be tendered to him again separately, but only that they might be tendered to him again separately, so that, *if* he had any objection, he might then make it. It would have been a useless ceremony for the Court to have tendered to him the jurors again separately after he had once accepted them in the absence of any declaration on his part that he desired to object to any of them. If such had been the right of the prisoner and the jury had been tendered to him again separately, he might again have elected them and then again have asked that they be tendered to him separately, so that there would be no end to the process. And, besides, his right of challenge peremptorily did not depend on the tendering of the jurors to him again separately. That was a right which he might have exercised at any time before a juror was sworn, and it did not depend on whether the jury was called up to be sworn one at a time or three or more at a time. Having once

230 SUPREME COURT.

O'Connor vs. The State.—Opinion of Court.

elected them, that election remained good until he declared his desire to retract it, and not having made any retraxit or expressed even a desire to do so, we hold that the Court did not err in ordering the jury to be sworn.

The 9th error assigned is, that "the Court erred in refusing to have the jury sworn to try the prisoner according to the law and the evidence."

The record does not state the precise form of oath which was used in this case. It only recites the names of the jurors, and then says: "Who being *duly elected, tried* and *sworn*," &c. In a subsequent part of the record, that is in the bill of exceptions, it is stated that "the jury was sworn three at a time, to find a verdict according to the evidence in the case, when the prisoner, by his counsel, moved that the jury be sworn to find their verdict *according to the law* as well as the evidence in the case, which motion the Court overruled, to which ruling the prisoner excepted."

The usual form of the oath, as prescribed in Robinson's Forms, is thus: "You shall well and truly try and true deliverance make between the Commonwealth and T. T., the prisoner at the bar, whom you shall have in charge, and a true verdict give, *according to the evidence.*"

In 1st Chitty on Crim. Law, page 552, the same form is given as the correct one, and so we hold.

The tenth assignment of error is that the Court erred in discharging the jury before the verdict was recorded as ordered to be recorded. The bill of exceptions states that the jury having returned into Court, and having answered to their names, the Court asked them if they had agreed on their verdict; they answered they had, and handed to the Court the indictment, on the back of which was written, "We, the jury, find the prisoner guilty. CHARLES PRATT, Foreman." The Court then said, "Do you all say that the prisoner is guilty?" to which the jury assented. Thereupon, on motion of the prisoner, the jury was polled, and each

juror answered guilty. Thereupon the Court discharged the jury. The counsel for the prisoner then objected that the jury had been discharged before the verdict was recorded, which the Court decided was not necessary, &c.

There is no doubt that the law, as contended for by counsel for prisoner, is correct, that the verdict must be recorded before the jury is discharged.—See 10 Bacon, 306; Graham Prac., 317; Graham & Waterman on New Trials, 1406; Chitty's Crim. Law, 635, 647; 3 Black. Com., 378; 3 Graham & Waterman on New Trials, *note* on page 1409.

But the question arises, what is meant by recording the verdict? It cannot mean that it must be regularly written down in the minutes of the Court. We know that this is never done. The Clerk usually makes a brief memorandum on the indictment or on his docket, and this is all that has ever been deemed necessary. In this case, the jury *themselves* recorded their verdict on the back of the indictment, one of the files of the Court. They brought their verdict so recorded into open Court. The Court then asked them, "Do you all say that the prisoner is guilty?" To which the jury assented, and thereupon, on motion of the prisoner, the jury was polled, and each one answered that he found the prisoner guilty. This we think was a sufficient recording of the verdict within the meaning of the law. In the case of Friar vs. The State, 3 How. Miss. R., the Court say: "In this case, the verdict was opened in the presence of all the parties and read aloud by the Clerk to the jury. The prisoner was thus afforded ample opportunity to poll the jury. It was then *a public verdict, spoken by the jury*, and we can see no reason for disturbing it on that ground." And, again, in the case of the Com. vs. Gibson, 2 Va. Cases, 73: "In a case of felony, after the verdict is rendered by the jury and read in open Court, it is the duty of the Clerk to direct the jury to hearken to their verdict as the Court has recorded it, and then to repeat the verdict to them, and either to poll

them or say to them, 'And so say you all,' or words to that effect; in which latter case, if none of the jury express their dissent, the verdict ought to stand *as recorded*, and until *the assent of the jury is expressed in one of these ways*, the jury have a right to retract it, and *until after the assent of the jury is expressed as aforesaid*, the verdict is not perfect."— See Robinson's Forms, 222.

We are satisfied, from the record, that very much the same ceremony took place in this case as in the Virginia case just cited. In this case, the *Clerk* did not repeat the verdict and ask them if they assented to it as recorded, but the *Judge*, being in possession of the written verdict, repeated the substance of it to the jury, by asking them, "Do you all say that the prisoner is guilty?" When they all assented, even after being polled, that that written verdict was their verdict, the Court must be considered as having adopted it as its own record, just as much as if the Clerk had made it. It may be that the true rule is that the verdict is considered as recorded, in the eye of the law, when it is *pronounced* by the jury in open Court and in the presence of the parties. The cases just cited from Virginia and Mississippi seem to point to that conclusion, but it is not necessary for us to decide that question now, and we will content ourselves with deciding that the facts shown by the record in this case concerning the recording of the verdict are not such as in law to vitiate it.

The 11th assignment is, " that upon the verdict in the record no sentence could be passed nor execution had."

The verdict was simply "guilty." There is but one count in the indictment, and that is for murder. The jury might, under this count, have found the prisoner guilty of manslaughter, but having found him guilty, it must be taken as referring to the offence in the indictment.—See 1st Chitty C. Law, 635–'67. If there were different degrees of murder in this State, punished by different penalties, as is the case

in some States, it would be necessary for the verdict to discriminate.

The 12th and last assignment of error is, that "the Court erred in refusing the motion for a new trial."

The 11th ground on which a new trial was asked was, that the jury, when they retired to deliberate on their verdict, were not placed under a bailiff sworn for that particular case, but under a bailiff only sworn for the term. The record sustains this allegation. Is that fact alone a sufficient ground for a new trial? We think not. We cannot perceive why the oath, taken by a bailiff to discharge his duty faithfully during the whole term, is not as binding on his conscience as would be an oath taken for a particular case. There is no question that the Sheriff might properly have charge of the jury, and yet he takes no oath except his oath of office. This bailiff seems to have felt the force of his obligation, for the record shows, that when one of the jurors attempted to communicate to him something concerning the trial, he said to him: "Don't tell me anything about it; I don't want to know anything you have to tell as a juryman, for I am sworn not to say anything to you, nor you to me." In many Courts, however, at the present day, it is not unusual that officers are sworn at the commencement of the term to take charge of all juries in civil cases, and probably there is no reason for greater caution in criminal cases.— Commonwealth vs. Jenkins et al., Thach. C. C., 131; 2 Graham & Waterman on New Trials, page 375, note.

In our sister State of Georgia, even the jurors are sworn for the whole term. The record states that the jury retired under charge of a sworn bailiff, to consult of their verdict. In the absence of testimony to the contrary, the Court must be presumed to have done its duty, and that the bailiff was fully instructed by the Court as to the nature of his duties. This ground for a new trial is not good.

28

Another ground urged for a new trial before this Court, though nothing is said of it in the record, is, that the Court acted as trior of the qualifications of jurors.

The law on this subject, as laid down in 3 Black. Com., 363, is this: "Challenges *to the favor* are where the party hath no principal challenge, but objects only to some probable circumstances, as acquaintance and the like, the validity of which must be left to the determination of triors, whose office it is to decide whether the juror be favorable or unfavorable. The triors, in case the first man shall be challenged, are two indifferent persons named by the Court, and if they try one man and find him indifferent, he shall be sworn, and then he and the two triors shall try the next, and when another is found indifferent and sworn, the two triors shall be superseded and the two first sworn on the jury shall try the rest."

But it is stated, in Wharton on Am. Crim. Law, 862, that if neither party asks for triors, but submit the matter to the Court, they are bound by its decision, and this we hold to be the proper rule.

The third ground for a new trial was, that Petry, one of the jury, was not a citizen of the United States.

The evidence on this point is, that the juror was born in Bavaria; came to this country while an infant, with his father; has never taken out naturalization papers, but his father did many years ago, and while the juror was still an infant.

"Under the naturalization act of Congress of 1802, the infant children of aliens, though born out of the United States, if dwelling within the United States at the time of the naturalization of their parents, become citizens by such naturalization; and the provisions of that act on this subject ... ... ... ..., so as to embrace the children of aliens naturalized after the passage of the act, as well as the children of

those who were naturalized."—See West vs. West, 8 Paige, 664. (433)

This ruling, which we adopt, makes the juror a citizen. There was therefore no error in the Court below having refused a new trial on this ground.

We have now disposed of all the grounds alleged for a new trial, except those growing out of the evidence before the jury, and the evidence afterwards taken before the Judge on the application for a new trial concerning the alleged misconduct of the jury. In order to determine whether the Court erred in refusing a new trial on either of these grounds, it is necessary to read and consider the evidence attentively. The evidence before the jury was as follows:

Mrs. Vashti Maddox, being sworn, says: I know James O'Conner, the prisoner; I know another man of the same name; the prisoner is older of the two; I lived near the prisoner last winter and at the time of the death of his wife, who was called Biddy; they lived together as man and wife, claimed each other as man and wife; about 2 o'clock in the evening, while at work in my garden, I heard a screaming and raised up and looked, and Mrs. O'Conner was *hollering*, and screamed three times for witness' husband to go there; my husband was not at home; she was hanging to the gate, and her husband took hold of her and told her she might *holler* and scream, but he would finish her before to-morrow morning, if she went to go in the house; I did not see her try to go in the house; I saw his elbow move and thought he was striking her, but did not see him strike; she said, kill me, Jim, kill me, but I'll go in; this was at the house where they were living at that time; when I saw them next, he had her by the hair dragging her around the end of the house, and this was the last I saw until she was found dead next morning; saw her early in morning; when carried to the house she was dead; I saw a .bulk which I supposed to be her before she was removed,

just below the place where the jail fence and Dave Walden's fence joins; in December of 1858, when these things occurred, in Franklin county; I helped to shroud her; I saw her before she was undressed; same dress she had on day before; gashes and bruises all over the body when I saw it after her death, and over the right eye a bad gash, and on the other a bad cut, ranging down the face; I will not be certain as to the side of the face; there was a wound upon the nose which appeared as if it might be done with a piece of iron; I saw much blood there; bed and pillows dripping with blood; I saw prisoner in his yard the next morning after the evening I have first testified about; I saw clothes after, poured out of a sack, which was said to be found under the house; I saw some check shirts, like the ones prisoner generally wore, and looked like an under-dress of hers, and a bonnet, the same I saw her have on the evening before, and the clothes were all bloody; I saw a knife taken by somebody and it was bloody; knife taken up from chimney; she laid down the knife; I saw a knife that the deceased cut meat with in cook room, which looked like the same knife, but cannot say it was the same knife; it was what they call a sheath knife; the prisoner and his wife lived in a little shanty, very small, but two rooms and the cook room; there was blood on the floor and blood all over Irish potatoes under the window in the bed room; I lived near them; heard a fuss in the night; my husband waked me up; noise heard was very heavy groans, (bad, dark, stormy night,) sounding like one very sick or with a fit on them—a very struggling groan; I never had the knife in my hand; there was nothing particular about the knife, that I noticed, which would enable me to know or identify it; at that time no person lived in the house with prisoner and his wife.

Cross-examined.—House on the street opposite the jail; some thirty feet, I suppose, from jail fence to prisoner's

house; may be as wide at street; I was at the palings and saw through them, I think after 2 o'clock; prisoner talked short, not very loud; width of street between Picket's house and O'Conner's house; the gate being right at edge of side walk; they were at the gate at the time I saw them; garden enclosed within jail fence, which is about 6 or 8 feet high and foot boards 2 inches apart; same fence there now; it was through the cracks I looked and saw them, a few steps from the fence; did not go nearer to fence at time, but simply raised up and looked.

Re-examined by State.—Cracks wide enough for me to see; nothing growing up outside; could see what I saw distinctly.

Mrs. Gordon.—I know the prisoner; I lived near to where he lived at the time of the death of his wife; I saw prisoner the evening before the death of his wife drag her in at the back door of his house out of the lot; he was forcing her into the house; that is all I saw; I heard nothing passing between them; he had hold of her by the shoulders; this was after dinner; I cannot say what time it was in the afternoon; I believe his wife's name was Bridget; I saw her after she was dead; I can't tell her condition.

No cross-examination made by prisoner.

Mrs. Pickett.—I knew the prisoner; I remember the evening when his wife was killed; I lived near them at that time; prisoner and his wife lived then together; I saw her run out from the door and prisoner after her, and he caught her at the gate and went dragging her to the door by the hair of her head; I saw her after she was dead; she was lying on the ground in the street; it was a rainy night; commenced raining in the evening; it was just at day-light next morning when I saw the body; it was between three and four o'clock in the evening when I saw him pulling her by the hair of the head.

Cross-examined.—Was told that a woman was lying there dead, and I went out.

H. W. Pickett.—I know the prisoner; he lived with woman as his wife; I knew the woman; she was found dead about the 20th December last; a negro boy came and waked me up and told me there was a woman dead out in the street; I got up and dressed and went out and found Mrs. O'Conner lying there, and went to the Coroner without disturbing the body; I put the body on door shutter, with the help of several men, and carried her in the house; body, when I found it, was lying on her back, clothes straight, arms lying by her side; I saw one gash on her head at that time; gash an inch long or longer; looked like it was to the bone; no blood in it; looked white; blood under back of head when we lifted the body; I saw a bundle, but did not see it taken out from under the house; in the house the next morning; I did not see much out of the way in the house, in the room I was in at first; afterwards found blood on the floor of bed-room; some blood on the floor, but not a great deal; something thrown over it; blood not in pool; did not lay thick on floor; sprinkled in places, may be two or three feet long; looked like blood; I saw bloody clothes; I saw some women's clothes, dress it may be; I saw a man's shirt; it was bloody on the sleeve and on the breast; don't know whose shirt it was; O'Conner took the shirt afterwards, and took it into jail with him; either a check or hickory shirt; it was with the other bloody clothes; don't remember bonnet; no one lived with prisoner and his wife at that time; body was lying 80 or 100 yards from O'Conner's house; but little sand, but grassy between where the body lay and prisoner's house.

Cross-examination.—Saw the bloody clothes at end of house; house 15 or eighteen inches above the ground; no boards around it at the end where I saw the clothes; part may have been boarded up, but a hole under the house,

which I recollect. By a juror.—I said that when the body was found it had been rained upon; I heard no noise that night; my house is nearer to prisoner's; that when I supposed lodged at that time.

Mrs. Robinson.—I know the prisoner; I knew Bridget O'Conner; they were man and wife; I saw her in her house the morning after her death; some of the clothes looked like his clothes and some looked like her clothes; they were all bloody; one a checked shirt and the other a white or kind of inside shirt; I saw her inside clothes; I saw a sun-bonnet which was check and kind of ginghams; the clothes which were hers were bloody; a knife dropped out of the bundle; it was a kitchen knife with long blade; was blood on the knife; it was taken, I think by the Coroner; I did not show the knife to Mrs. Maddox, but she was there, and think she saw it; I was in the house next morning; I saw blood on pillows and sheets, and bed in bed-room; some places looked like it was washed off, but not all washed off; was blood on floor; some blood all over the floor.

Cross-examination waived by prisoner.

Dr. Hunter.—I know the prisoner; knew his wife; I am a practising physician in this town; made a *post mortem* examination of the body of the deceased about the 21st December last; a chop, as with a knife, over the right eye, extending from the eye-brow upwards to about the edge of the hair, almost perpendicular; the other cut, from the same cut down to top of the ear, seemed to have been done with a heavy knife, with a chopping stroke; the first cut not dangerous, but the second severed a branch of the temporal artery, which would produce death in three or four hours, generally, if not attended to ; on the left side was a wound from the ear, severing the top of the ear, entering skull rather back and over top of the ear, a septum which wounded another important artery, the submutal artery or auricular artery, which would cause a considerable flow of blood; ten

wounds on the head, one of them where parital occipital and temporal bones unite, as though the wound was stricken from behind, or when the head was turned away, and calculated to produce death, having entered the skull; two stabs with the point of knife, near the right ankle, severing an artery from which much blood would flow; abdomen much bruised as though it had been kicked; nose appeared to be stricken with a heavy missile, as with a brick or half brick; neck bruised; legs, hands and feet; thighs much bruised, the last as if with a boot or shoe; the uterus was perfectly excised; the protrusion from inverted womb excessive; died loss of blood; house all covered with blood, particularly in the room in which she slept; flag or cat-tail scattered over the floor; an attempt had been made to wash off the blood; a quart of blood or more in pool back of the bed; flags had no blood on them, except when turned over, and had been thrown upon the blood; I should think the blood I saw would bleed anybody to death; don't know the quantity, but think at least 6 or 7 lbs.; they lived together (and by themselves) as man and wife.

No cross-examination.

H. W. Pickett recalled by State to prove a fact which the Solicitor says was inadvertently omitted.—I saw no blood on the clothes of deceased when I first saw her lying in the street; saw no sign of soil or blood on dress; I did not notice it; she was very wet; I went to house of prisoner to get him to open the door, so as that we could take her in the house; the door was closed; he was inside the house, standing at the window and looking through the window.

This is all the evidence that was before the jury. Most of it is circumstantial, but the circumstances all point with such direct and overwhelming force to the prisoner as to leave no rational doubt that he is guilty of one of the most cruel, barbarous and unnatural murders that it is possible for the imagination to conceive of. If this murder had been

O'Connor vs. The State.—Opinion of Court.

committed on the body of a *man*, it would have been shocking; if it had been committed on the body of a woman who was a stranger to him, it would have been most revolting; but, committed as it was, on the body of his own wife, in comparison with whose safety he was bound by every obligation of Heaven and of earth to regard his own life as but "the small dust in the balance," it was shocking, revolting and horrible far beyond the power of human language to express it. It was not by a single blow, given in the heat of passion, that the prisoner extinguished the life of his most unfortunate wife. Much time must have been consumed and different instruments used, to inflict all those bruises, cuts and most fiendish lacerations and mutilations which the dead body exhibited.

The evidence of the prisoner's guilt is too plain for argument. He and his wife lived alone in a small shanty. In the afternoon he is seen dragging her by the hair of her head, and threatening to "finish her" before morning; his arm is seen moving as if he was striking her, and she is heard screaming for assistance. The next morning, after a dark and stormy night, her dead body is found near his house with little or no blood on it, but the floor of his house is found "covered all over with blood," the pillow and sheets of her bed are "dripping with blood," a bloody knife is found in his house and her bloody clothes, with a bloody shirt of his own, are found in a sack under his house; he is found in the house, looking out at the window. None of these circumstances are palliated or explained away.

With this testimony before them, the jury had but one duty to perform, and that was to find the prisoner guilty.

The subsequent evidence before the Judge on the application for a new trial, concerning the misconduct of the jury, was as follows:

John M. Gorrie, being duly sworn, testified as follows:
29

On the day when this verdict came in, heard the bell ring; walked towards Court House; as I came to side-walk, near Court House, I saw Mr. Carrigan walk down the steps; at same time Williamson and Coley were coming down; Mr. Carrigan walked under the steps; I saw no sworn officer in attendance upon him; he walked out and went up stairs alone; I saw no officers in sight; I heard one of the jurors (Mr. Orman) say that the jury examined the law books which were in the Court room and looked at authorities which had been quoted by counsel; that Donald McDonald (not stated who in ground for new trial) got up, made some remark or other and then, he said, they went into a vote; they amused themselves by reading books, as they had nothing to do, and did not tell me that it had influenced his verdict, but, to the contrary, it had not, and he supposed no other person was so influenced.

John Milligan, being duly sworn, testified as follows: I was sworn as bailiff during the present term; was not sworn specially for jury in the case; I had charge of the jury most of the time; Mr. Lucas assisted; I mentioned to him (Mr. Carrigan,) you are a terrible set of fellows in there; he said, we can't agree—no chance to agree; I said, don't tell me anything at all about it, I don't want to know anything you have to tell as a juryman, for I am sworn not to say anything to you, nor you to me; oh, says he, I had forgot all about it; I told him not to say anything more, and he did not; he said Cullen and him were holding out, (this he told me voluntarily, without my asking any questions,) but I am afraid he will give out, as he is hungry, &c.; as for me, I will stay here until my toe-nails drop off before I give in another inch; all this was said before he said as above that "I had forgot," &c.; I did not notice the jury examining said books; the conversation was at foot of steps that led down from the Court room; he went out to make water; I saw no one else attempt to influence verdict.

Martin Carrigan, being duly sworn, testified as follows: I was a juror in this case; I heard the testimony of John Milligan; I was the juror with Milligan; I do not remember the expression of Milligan that we were a terrible set of fellows; I was coming up the stair buttoning up my pants; he asked, how do you stand? and I said, ten to two, Cullen and I; this is all I remember to have passed at that time; he upbraided me for having talked at all; said he was an officer and ought to be no talk at all; I then went into the room; all that I recollect I said; I said nothing about toenails; he said nothing to me to influence my verdict.

William Petry, Sr., being duly sworn, testified as follows: I am father of William Petry, Jr., one of the jurors; he was not born in the United States; was born in Bavaria; he is near 23 years old now; he came here in 1840; he never took out naturalization papers as far as I know, but I have 12 or 13 years ago.

William Petry, Jr., being duly sworn, testified as follows: Don't remember how old I was when I came to this country; never took out papers of naturalization.

H. K. Simmons, being duly sworn, testified as follows: I had jury in charge several times, and the bailiffs, Mr. Lucas and Mr. Milligan, both sworn; Lucas sworn as Deputy Sheriff; jury was put in Court room by order of the Court between 2 and 3 o'clock in the morning; I took all notes of evidence and removed from the room; Court instructed the jury not to examine the books; I found books open and closed them; from 3 o'clock until after breakfast; 11 to 1 dozen volumes of books in the room; don't know that the jury used the books.

Martin Carrigan (recalled)—I came out to the officer; asked him to go down with me; I wanted to make water; he went with me to the top of the stairs, and told me to go down and do what I had to do and come up again; the officer was standing at the top of the stairs until I got through

and came up to go into the jury room; he could not see me when I went under the stairs; I staid but a very short time, say two or three minutes—no longer than I was obliged to stay; I did not talk with any one, or any one with me; the officer was at the head of the stairs when I came back; I did not see any reading the law books, but for amusement and to keep them from sleeping; I do not know that the jury read any of the law used in the argument and made no use of it.

Thomas Mathews, a juror, testified as follows: That he separated from his fellow jurors upon a call of nature; he went out in the street about forty or fifty yards from the jury room; that he, being compelled to go, asked the bailiff to go with him, who said he would not leave the balance of the jury, and that he would trust him by himself; that juror's absence was about five minutes, and that during his absence he did not converse with any person whatever about the case or anything else.

John Lovett, Sr., sworn for defendant.—I know Martin Carrigan, a juror in this case; in April or March last, prior to this trial, Martin Carrigan said the prisoner would be hung; I said he would not; he said that the prisoner would, and then we bet a hat or a pair of shoes on it and shook hands on it. Cross-examined.—The bet was made before O'Conner was on trial; I bet in earnest; Carrigan never said a word to me about the bet from that day to this, nor I to him, and I never mentioned the matter until after the prisoner was found guilty.

Martin Carrigan, a juror, testified: That some time during the year he was in conversation with several persons in regard to this case, and the question of the prisoner's guilt or innocence was brought up, and one Lovett (the witness) offered to bet that the prisoner would not be hung, and juror said he would bet him that he was already "well hung," meaning thereby he was well hung in an animal

sense; in *forma tauri;* that said bet was made in jest; that juror had not since thought of it, and that it did not occur to him during the trial, and did not in the least influence his verdict, and the juror said that was the only bet he made.

This closed the testimony for new trial.

This testimony exhibits some irregularities in the jury, but not sufficient, as we think, after a strict investigation of the authorities, to vitiate their verdict. When this evidence is taken in connexion with the testimony before the jury, showing plainly that they could have found no other verdict than that which they did find, we are very clearly of opinion that the Court did not err in refusing to grant a new trial. Nothing, therefore, now remains for the Court but to discharge the painful duty of declaring that the judgment of the Court below is affirmed.

Let this case, therefore, be remanded to the Circuit Court in and for the county of Franklin, and the Judge holding said Court be directed to cause the said James O'Conner to be brought before him in open Court, and nothing appearing why sentence of death should not again be passed upon him, that said Judge, in open Court, do re-sentence the said James O'Conner to be executed, at such time and place as the said Court may deem fit and proper, and that said Court do cause said sentence to be carried into execution.