## SILAS GLADDEN, PLAINTIFF IN ERROR, vs. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. Under the statutes of this State regulating the subject at the time of this trial, there must have been fifteen grand jurors on the panel as originally drawn.

2. After organization of the grand jury, in accordance with the terms of the statute, their proceedings are governed by common law rules, and the improper discharge of one member of the grand jury does not vitiate its proceedings if a sufficient number to find an indictment remain.

3. Every indictment must be found by at least twelve, but it is not necessary that all above that number should be present consenting.

4. The rules of law in granting continuances in civil and criminal cases are substantially the same, except so far as they are modified by the difference in proceeding. In criminal cases, however, the grounds for the motion should be scanned more closely than in civil cases, on account of superior temptation to delay.

5. In a motion of this character much must be left to the tribunal before which the parties are. Circumstances occurring in its presence often indicate whether such motions are in good faith, and a writ of error will not be sustained on account of the refusal of the court to grant a continuance

unless it is a plain and palpable instance of the arbitrary and oppressive exercise of the discretion necessarily vested by law.

6. In applications for a continuance it must be shown by affidavit that the witness has been duly served with a subpœna, or a satisfactory reason assigned for the omission, and when it is not served, and the time at which the subpœna is issued is not disclosed, nor the residence of the witness stated, so that this court can determine the propriety of the order of the court below in these respects, this court will not interfere.

7. General objections to questions addressed to witnesses, without stating the precise ground of objection, are vague and nugatory, and if entitled to weight anywhere are without weight before an appellate court. If any grounds of objection were stated in the court below, the bill of exceptions should disclose them, and when they do not so appear this court will not pass upon them when urged here by way of argument or embodied in the assignment of errors.

8. A past quarrel or encounter, if sufficient time for the cooling of passion has transpired, does not justify the killing of an unarmed man with a deadly weapon.

9. The court, after charging as to the different grades of homicide and the requisite evidence to support them, is not bound on the motion of either party to repeat the same charge in substance, though varied in terms.

10. An instruction to the effect that "if you believe from the evidence that the prisoner killed the deceased through fear or cowardice, or under the belief that great bodily harm is about to be done, although there was no danger to life or great bodily harm, it will be a justifiable killing, and you will acquit," is properly refused. Every person is presumed to be sane, and he should be held responsible for reasonable deductions. The *belief must be reasonable ;* there must be reasonable ground for apprehending a design to take away life or do great bodily harm, and reasonable ground for believing the danger imminent that such design will be accomplished at the time of the killing.

11. Before a person can avail himself of the defense that he used a deadly weapon in defense of his life, and be justified, he must satisfy the jury that the defense was necessary at the time; that he did all he could to avoid it, and that it was necessary to protect his own life or to protect himself from such great bodily harm as would give him a reasonable apprehension that his life was in immediate danger.

12. What facts justify or excuse a homicide is a question of law. It is.

564      SUPREME COURT.

Silas Gladden vs. The State of Florida—Statement of the Case.

the province of the court to state what the rules of law are as to facts, and of the jury to determine whether such facts exist in the particular case.

13. It is within the province of the court, after defining the different grades of homicide, to restrict its charges to points of law arising upon the facts, being careful to give such instructions as cover all reasonable deductions.

14. The prisoner, in a capital case, must be personally present during the whole of the trial, and at every step taken in the cause. He has the right to discuss questions, both of law and of fact, and no step can be taken in his absence.

Writ of Error to Circuit Court for Jackson county.

The plaintiff in error was indicted for the murder of Addison Fullerton. On the morning of the day of the homicide, the prisoner and deceased met casually at a house called the "Tidwell Place." A difficulty occurred there between the parties.

Eliza Jane Tidwell (for the defense) testified in reference to this antecedent difficulty: "That the parties met at the Tidwell Place. That Mr. Gladden said: 'Addison, I suppose you are going to sell me out.' Mr. Fullerton replied: 'Attend to your business and I will attend to mine. It ain't me going to sell you out, it is the sheriff. I don't want your property.'" Whereupon, the witness states: "Fullerton jumped up with his knife in his hand and run at Mr. Gladden, run him around the smoke-house, then jumped in the door and got the gun, ran out in the piazza and presented the gun at Mr. Gladden and said to him, 'God damn you, leave here. I will kill you before sundown if there is powder and lead to do it.' Mr. Gladden then mounted his horse and rode off."

Other witnesses testify about the same, and also state that when Gladden was running around the house, and Fullerton was following him, he (Fullerton) said "he would cut his lights out."

Another witness, W. W. Tidwell (for the State), in detailing what he saw of this previous difficulty, says: "I was at Tidwell's place. I saw both parties. The first I heard was a re-

mark of Mr. Gladden. He told Mr. Fullerton to shut his mouth. Mr. Fullerton told him he would not do it. Then Mr. Gladden jumped up and said: 'By God, I'll make you do it.' Fullerton then got up. Mr. Gladden struck Fullerton with a stick, a common-sized walking-stick. The stick was cracked. After the blow Mr. Gladden ran and Fullerton took after him. Gladden ran out one door, round the smoke-house, out of the gate, and jumped on his horse. When he got on his horse Gladden said to Fullerton, 'I will kill you before the sun goes down.' Fullerton replied, 'I can shoot as much as you.'"

Gladden, after riding off, went to his house, distant about one or one and a quarter miles from the place of difficulty, and returned with his gun. He was absent from a half to three-quarters of an hour. Upon his return he shot and killed Fullerton. The circumstances are thus stated in substance by the witnesses:

John Johnson (for the State): "Addison Fullerton was shot by Silas Gladden. I was pretty close when he shot him—was thirty or thirty-five steps from Gladden. I was sitting in the house, when some one in the house said: 'Yonder comes Mr. Gladden with a gun.' I looked out the door and saw Mr. Gladden on horseback. He reined up his horse. Mr. Fullerton, who was a few yards ahead of Mr. Gladden, was walking off from him. Fullerton stopped and turned his face towards Mr. Gladden. While he was turning Gladden raised the gun, and about the time Fullerton was turned, the gun fired. I think the distance between the parties at the time of firing was about fifteen or eighteen yards. Fullerton stood up a moment and then fell."

W. C. Grant (for State): "Fullerton was killed by Gladden. I saw Gladden shoot him down. When I got to the door, heard Mr. Gladden, who was on horseback, order Fullerton to stop. Fullerton, who was on foot, told him he would not do it. Mr. Gladden told him he would make him stop, and put his gun to his face and fired. Fullerton walked about five steps and fell. He lived about a minute and a half. Mr. Fullerton was not

566 SUPREME COURT.

Silas Gladden vs. The State of Florida—Opinion of Court.

armed. He had a branding-iron twelve or fifteen inches long in his hand when he was shot."

Lucy Ditty (for State): "I saw Gladden shoot Fullerton. I saw Mr. Gladden come up with a gun. Mr. Fullerton was going from him. Gladden told Fullerton to stop, and as he stopped and turned around Gladden shot him."

W. W. Tidwell (for State): "Mr. Gladden came up behind Fullerton and told him to stop. Fullerton said he would not do it. Mr. Gladden told him, 'I will kill you, then.' Mr. Fullerton said he was ready to die. Mr. Gladden presented his gun and fired. Mr. Fullerton had a branding-iron in his hand."

*J. F. McClellan* for Plaintiff in Error.

*J. C. McLean* for the State.

WESTCOTT, J., delivered the opinion of the court:

Silas Gladden, the plaintiff in error, was indicted for the murder of Addison Fullerton at the spring term, 1868, of the circuit court for Jackson county.

As the case is decided for the most part upon purely legal grounds, we deem any lengthy statement of the facts unnecessary.

From a careful inspection of the first page of the record we find that only fourteen persons "were drawn to serve as grand jurors during the term" at which the indictment was found. The statutes regulating the organization of grand juries cannot, by any known rule of construction, be held to authorize this, and while no such error is assigned by the plaintiff, yet it is apparent upon the record, and this being a capital case the court cannot pass it by without notice. No man should be tried for a capital crime upon an indictment of this character. Otherwise, not being assigned as error, and not mentioned in argument, it would be proper to pass it by.

There must be fifteen grand jurors on the panel as originally drawn. 17th Ohio, 224; 5 Eng., 71; 1 Blackf., 320.

This is an error which reaches all subsequent proceedings, and we might well dispose of the case upon that ground; but some of the errors assigned raising important questions of criminal law and practice we deem it proper to notice them.

On the first page of the record the following entry appears:

"The grand jury came into court and reported that they, by their foreman, had excused John W. King, one of their number, from attendance on grand jury on yesterday, before any investigation was had before them."

Plaintiff in error viewing this action of the grand jury such as vitiated all of their subsequent proceedings, plead in abatement at the proper time, that " during the term of said court one of the jurors was excused by that body from serving on said jury, and did not serve as a grand juror during the term of the court at which the bill of indictment was found."

Upon demurrer to this plea, this question arose, viz.:

Whether, after the legal organization of a grand jury, the absence of one of its members, by permission of that body, from its consultations, and his failure to act with the others in finding a bill of indictment, is a good plea in abatement. The judgment of the court sustaining the demurrer is the first error here assigned.

It is insisted for the plaintiff in error that "the grand jury as a body could exercise no judicial powers, and could not adjudicate as to the qualifications of any of their number," and that this was a judicial act.

Without passing upon this question, it is evident that the act of excusing a juror, whether by the court or the grand jury, even though improper and for insufficient cause, cannot vitiate their subsequent action if his presence was unnecessary. The practice of excusing grand jurors from attendance is one which should not be encouraged, but at the same time we cannot see that the absence of one grand juror, however improperly permitted, vitiates their proceedings if the requisite number necessary at common law to find a true bill remain.

In Alabama a grand jury legally constituted of thirteen members under the statute, is competent to act, although it may be subsequently reduced by the absence of one juror to twelve. 3d Ala., 343.

In Indiana, by statute, the names of eighteen men are to be drawn from the box for the purpose of being summoned as grand jurors. The grand jury, however, when convened may consist of any smaller number not less than twelve, as at common law. 1st Black., 317.

In North Carolina it is held that the statute upon the subject of a grand jury is only directory to the court, and does not declare void a bill or presentment found by a grand jury consisting of the common law number. 2 Ired., 153.

So in Tennessee the acts upon this subject were held to be only directory as to the number beyond which jurors shall not be sworn upon the grand jury, and the number twelve will constitute a sufficient number to act. 3d Humph., 49.

In Iowa the statute providing for the organization of a grand jury is held by the courts to be mandatory and peremptory. It provides that "when grand jurors are to be selected their number *must* be fifteen, and they *shall* serve for one entire year thereafter." Here it was held that the whole number must act. 3d Green, Iowa, 515.

It was held in Portis vs. The State, 23 Miss., 583, that if after a grand juror has been irregularly discharged a sufficient number to constitute a legal grand jury remain, the body will preserve its organization, and its acts will be valid, provided no substitute be sworn in.

The statutes of this State regulating the subject do nothing more than simply provide for the mode and manner of the organization of a grand jury and the number of which it is to be composed. After an organization in conformity to the statute, the common law rule applicable should control, which is, "That every indictment and presentment by the grand jury must be found by twelve at least, but it is not necessary that all above

that number should concur in such presentment or indictment." 3 Bac. Ab., par. 725.

In this case, whether the act of the grand jury in discharging one of its number be proper or not, it does not follow that the grand jury were rendered illegal.

After the discharge of the grand juror a sufficient number remained to constitute a legal grand jury, and if there had been originally fifteen grand jurors on the panel no such consequence would have resulted.

The judgment of the court sustaining the demurrer was correct, and there was no good plea in abatement.

The next error assigned is the refusal of the court to grant a continuance upon a motion based upon an affidavit containing the following grounds for the motion:

"That defendant cannot safely go to trial at this term of the court on account of the absence of Jane Anderson, who is a material witness for this defendant, and by whom he expects to prove that at the altercation between him and Addison Fullerton, which terminated in the death of the latter, Addison Fullerton was the aggressor; that said Fullerton commenced the difficulty and assaulted this defendant with a deadly weapon, to wit, a knife, and pursued him with the same while the defendant was fleeing from him, and that when the defendant got beyond the reach of the knife of the said Fullerton, that he, Fullerton, attempted to shoot the defendant with a gun, and inquired for powder and lead for that purpose, and then said to defendant that he would kill him before the sun went down if powder would burn; that while the said Fullerton was pursuing the defendant with his drawn knife they were both running rapidly around the house, and Fullerton using such expressions as, 'Damn your soul, I will have your heart's blood. I will cut out your lights;' that a subpœna has been issued for the said Jane Anderson, but has not been served; that he does not believe he will be able to procure her attendance at this term of the court, but that he will be able to procure her attendance at the next

48

term of this court; that the said Jane Anderson is not absent, either directly or indirectly, by any cause or procurement of his; that she is the only witness by whom he expects to prove all these facts; and that this application is not made for purposes of delay only, but that justice may be done."

There were two affidavits and two motions made, but we consider only that which was based upon the strongest grounds.

The term at which this case was tried commenced April 27th, 1868; the prisoner was indicted April 30, and this application for continuance was made seven days afterwards, upon the 7th of May.

The rule in granting continuances in civil cases as held in this State is, "that when a party applies in a civil court for a continuance for the term, on the ground of the absence of a witness, it must be shown by affidavit, *that the witness has been duly served with a subpœna, or a satisfactory reason assigned for the omission;* that he is absent without the consent of the party directly or indirectly given; that he resides in the county where the suit is pending, or if out of the county good cause must be shown for not taking his deposition; that the testimony is material; that the applicant expects to procure said testimony at the next term; that the application is not made for delay only; that he cannot safely proceed to trial without evidence of said witness; and the party must further state the facts expected to be proved by the witness." 9 Florida, 490.

What is the rule in criminal cases? Is more or less required?

In speaking of motions for a continuance, Sutherland, J., 7 Cowen, 390, says: "The rule is substantially the same both in civil and criminal cases, though in the latter the authorities all agree that the matter is to be scanned more closely on account of the superior temptation to delay and escape the sentence of the law."

In speaking of a similar motion, Grimke, J., 1 Bay, 1, 2, says: "The rule of law for putting off trials is the same in criminal as in civil cases."

In the absence of a statute similar to ours upon the subject of continuances, it has been held that the exercise of this discretion cannot be reviewed on error. 6 Cranch, 206 ; 15 Ala., 43 ; 6 Iredell, 98.

It was held in Virginia that it would not be controlled unless the case was a very plain one. 2 Virginia Cases, 6.

. In Georgia a writ of error will not be sustained on account of the court below refusing to grant a continuance in a cause, unless it is a most plain and palpable instance of the arbitrary and oppressive exercise of the discretion necessarily vested by the law. 1 Kelly, 215.

The statute creating the Supreme Court of Georgia made this discretion the subject of review.

While the doctrine in Alabama and North Carolina cannot prevail here, where we have a statute making it the subject matter of review, yet, unless it is apparent that the discretion has been exercised in an arbitrary and oppressive manner, to the manifest injury of the defendant, we will not control it.

An appellate tribunal should never, except in a plain case, control discretion of this character in matters of practice, as it has not the opportunity of knowing many things which should to some extent control in its exercise, and which the court before which the case is tried knows necessarily.

As remarked by the court in 12 Grattan, 576, " Applications for continuances are addressed to the discretion of the court, and much must be left to the tribunal which has the parties before it, and must determine from a variety of circumstances *occurring in its presence* whether applications are made in good faith."

A careful examination of this affidavit will disclose that the date the subpœna was issued is not stated, and that it does appear that it had not been served. It is impossible for us to know from the record when the subpœna was issued, nor can we learn any reason for the want of service. There may or may not have been one.

It will be noticed that the place of residence of the witness is

not disclosed in the affidavit, and that so far as it states the inability of defendant to procure the attendance of the witness at the term, it is general and is based upon belief. The subpœna may have been issued two hours before the affidavit was made, and the witness may have resided within five miles of the court, and the failure to serve may have been the result of the laches of the defendant in getting his writ issued. All of this might be so, and still be consistent with the facts set up in this affidavit. The court below had it in its power to inspect the papers and ascertain whether it had been returned, and if not, it could ascertain from the officer when it came to his hands.

The court, in People vs. Baker, 1 Cal., 404, say : "We think the affidavit does not show a case upon which the court could be required to grant a continuance. It does not show due diligence on the part of the defendant in endeavoring to procure the attendance of his witness. It does not appear at what time the subpœna was issued, at what time the witness left the county, or what efforts were made to procure a service of subpœna upon him."

These remarks are entirely applicable here, and we adopt them.

A party assigning as error matters of this character under the statutes, which are to a great measure within the discretion of the court below, must see that his record discloses all the facts necessary to show to this court an arbitrary and improper exercise of discretion. When the record is uncertain or silent, all presumptions are in favor of the ruling.

Under the circumstances we do not think the record presents such a case as calls for the interference of an appellate tribunal as to this assignment of error.

The third, fourth, fifth, sixth and seventh errors assigned, consist principally of exceptions to the rulings of the court admitting or refusing to admit questions to witnesses.

In the view we have taken of the case, it is unimportant to consider them further than to remark that the record fails to dis-

close the grounds of objection which were stated and brought to the attention of the court below, if any were stated.

In 3 Howard, 575, the court say, when reviewing the action of the court below in overruling general objections to the reading of depositions where no ground of. *objection appears from the record to have been stated:* "We must consider objections of this character as vague and nugatory, and if entitled to weight anywhere, are without weight before an appellate court." If any grounds of objection were stated in the court below, the bill of exceptions should disclose them, and when they do not so appear, this court will not pass upon them, urged here, unless the matter is of a very serious character. Indeed, the authorities indicate that they should not be heard at all.   5 Barb., 406 ; 1 Cowen, 622 ; 1 Hill, 91 ; 1 Wendell, 418 ; 12 Wendell, 504. It is not enough to embody the grounds of objection in the assignment of errors, or to urge them by way of argument.

If the grounds of objection do not appear in the bill of exceptions, they cannot properly be considered.   After the bill of exceptions is signed, nothing to the contrary can be averred and no omission supplied.   3 Dall., 38 ; 1 Bac. Ab., 529 ; 2 Cain, 168 ; 5 Bos. & Pull., 36.

The eighth error assigned is based upon a general exception to the entire charge of the court upon the subject matter in hand, without stating, so far as the bill of exceptions disclose, any particular ground.

The general charge to a limited extent may be wanting in certainty, but we deem it unnecessary to refer to it at length.

The refusal of the court to give the following charges asked for by the defendant is assigned as error :

First. If the jury believe from the evidence that the prisoner at the time he killed the deceased had reason to apprehend death or great bodily harm to himself unless he kills the party, the killing is justifiable.   To constitute a danger to the life need not be of immediate death, but of such an injury as will shorten the period of the person's earthly existence.

This instruction, under the facts in this case, was properly refused. It is to the effect that if the prisoner at the time he killed the deceased had reason to apprehend death or great bodily harm unless he kills, he is justified. In this case there had been a previous encounter some half an hour before the killing, and at the time of the killing deceased was in no situation to do harm to the defendant.

At the time he killed the deceased he may have had reason to apprehend generally bodily harm from this previous encounter, from feelings then engendered and threats then made. There may have been reasons in one sense for such an apprehension, but they could have been no justification for the killing unless the deceased was in such a situation at the time of the killing as to endanger defendant's life or place him in danger of great bodily harm. Such an apprehension is one of the requisites to justify, but there must be in addition acts of the deceased happening and transpiring at the time of the killing, or at any rate not at a remote period. A past quarrel or a past encounter, if sufficient time for the cooling of passion has transpired, is not such a reason for the apprehension as would justify the killing of an unarmed man with a deadly weapon, and yet such a past quarrel may be in some sense a reason for a general apprehension of great bodily harm for some time afterwards.

The last portion of the instruction is, " to constitute a danger to the life need not be of immediate death, but of such an injury as will shorten the period of the person's earthly existence." We cannot see how there can be " a danger to the life," and yet no danger of immediate death, unless the danger to life is from some remote cause not then existing and actively present.

This instruction is not only defective in this respect, but we think the charge of the court was explicit and full upon the point so far as it was legal.

The court, after charging as to the different grades of homicide, and the requisite evidence to support them, is not bound

on the motion of either party to repeat the same charge in substance, though varied in terms.

If an instruction is asked involving a principle not before stated, and yet applicable, the court might give it or modify its own charge to cover the principle.    8th Eng. Repts., 317.

The second instruction asked and refused was : " If you believe from the evidence that the prisoner killed the deceased through fear or cowardice, or under the belief that great bodily harm is about to be done, although there was no danger to his life or great bodily harm, it will be a justifiable killing, and you will acquit."

This instruction is based upon the doctrine enunciated in the case of Grainger vs. The State, 5 Yerger, 459, and is in effect that the act is justified if the prisoner killed the deceased under the belief that great bodily harm was about to be done, although there was no such danger.

The facts in these cases are certainly very different.  In Grainger vs. The State, the court say : " Grainger used all the means in his power to escape from an overbearing bully.  He shot only to protect himself from threatened violence, and that great.   He behaved like a timid and cowardly man, was much alarmed, and was cut off from the chances of probable assistance."   Here, at the time of the killing, Gladden was on horseback several yards off with a gun in his hand, and his victim without any like weapon, in no position to strike or even to defend himself.

Independent of the facts, however, every person is presumed to be sane, and the law holds him responsible for reasonable deductions, and when we cease to hold him responsible to such an extent we are in a labyrinth of never-ending uncertainty.

The belief must be reasonable; there must be reasonable ground for apprehending a design to take away life or to do great bodily harm, and reasonable ground for believing the danger imminent that such design will be accomplished then. 2 Comstock, 193 ; 1 Park. Crim. Rpts., 154.

Before a person can avail himself of the defense that he used a weapon in defense of his life, and be justified, he must satisfy the jury that that defense was necessary at the time; that he did all he could to avoid it, and that it was necessary to protect his own life or to protect himself from such great bodily harm as would give him a reasonable apprehension that his life was in immediate danger. 1 Archbold's Crim. Pldg. & Pract., 796; Reg. vs. Smith, 8 Car. & P., 160.

The next instruction asked and refused, numbered five, so far as it had any application to the case, and so far as it should have been given, was embraced sufficiently in other charges of the court.

The next instruction, numbered six, and refused, was: "You must be the judges whether the danger must be immediate or unavoidable at the time of killing. To justify the prisoner in the act must depend upon the facts and circumstances of the whole state of facts before him as proven before you."

What facts justify or excuse the killing is a question of law not to be determined by the jury.

What facts are sufficient to excuse the act may be stated by the court, and it is the province of the jury to determine whether such facts exist in the particular case.

The next instruction, numbered eight, which was asked and refused, was properly refused for the reasons stated in the previous portions of this opinion. It is within the province of the court, after defining the different grades of homicide, to restrict its charges to such a state of facts as exist. Under the laws of this State the court must confine its charge exclusively to points of law; but as every charge upon a point of law must be based upon a given state of facts, it is not the duty of the court to extend their charges beyond what is properly embraced within the testimony adduced. It should be careful, however, to give instructions covering all reasonable deductions of fact.

Thus, in a case where there was no question as to the use of a deadly weapon, as in this case, and where the testimony of

all the witnesses to the act was explicit as to this fact, it is within the province of the court to restrict its charge to such points of law as are applicable in a case where the use of a deadly weapon may or may not be justified.

The last error assigned is the denial of the motion for a new trial upon the several gounds alleged.

We will consider but one of them, which was the absence of the prisoner from the court for some minutes three several times during the progress of the trial—at one time when one of the State witnesses was being examined, at another when a witness for the defense was being examined, and a third time during the argument of counsel. The absence was voluntary, but without any express waiver of his right to be present.

It is unnecessary for us to determine whether the prisoner can waive his right to be present during the trial, or whether a simple voluntary absence upon his part can be held to be a waiver of his constitutional right, and authorize the State to proceed in his absence. These questions have been settled in this State.

This court has laid down the rule very broadly, and has, perhaps, extended it beyond the views of the courts of some other States.

In Holton vs. State, 2 Fla., 500, the court say: "During the trial of a capital case (the whole trial) the prisoner has a right to be and *must be present. No steps can be taken by the court in the trial of the cause in his absence. The prisoner charged must be present in court to make his objections to any and every step* that may be taken which he may deem illegal." According to this view there was manifest error here, and the court should have awarded a new trial. We do not propose to examine the cases upon the subject. It is a decision covering the precise point.

Let the judgment of the circuit court of Jackson county be reversed, the indictment quashed, and the prisoner held to answer to a new bill of indictment to be preferred against him,

and the cause be remanded for further proceedings in accordance with this opinion.

If, however, upon an accurate examination of the record of the court below, it appears that the grand jury, when organized, consisted of fifteen persons, it is then ordered that a new trial be awarded, and that the cause be remanded for further proceedings in accordance with this opinion.