GEORGE W. IRVIN, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. On a motion for a change of venue, it is not sufficient for the party making such application to swear "that he does not believe that

Irvin v. The State of Florida—Syllabus.

he can obtain a fair and impartial trial " in the county in which the indictment was obtained.   He must fully state the facts upon which he founds such belief.

2. A motion to change the venue is always addressed to the sound discretion of the court, and this court will not interfere unless it can find in the record some good reason for believing that there was not an exercise of such sound discretion on the part of the court below in refusing the motion for such change.

3. Counsel for prisoner entered a motion for a change of venue, but failed to call the attention of the court to it.   The cause was continued on his motion.   The next term when the cause was reached for trial, the counsel for prisoner proceeded to such trial without taking any notice of his motion for change of venue, or calling the attention of the court to such motion :  *Held*, That the motion for change of venue must be considered as having been abandoned, and that there was no error upon the part of the court.

4. The court is not obliged to instruct the jury upon all principles of law that counsel may think proper to ask, or to go outside of the case as made, and charge upon questions of law foreign thereto. They may properly refuse to charge upon any such questions as are not applicable to the facts in evidence.

5. Affidavits in support of a motion for a new trial charging that a juror, before the empanelling of the jury, had formed and expressed an opinion that the prisoner was guilty, and at the same time had said he would hang him if he was on the jury, should unequivocally allege that the prisoner and his counsel were ignorant of the fact as stated at the the time of the empanelling of such jury.

6. In charging the jury in a trial for murder, the court instructed them that if under certain circumstances detailed, "the accused, being armed with a concealed pistol, walked up to the deceased and intended to kill him, did then and there kill him by shooting him with the pistol aforesaid, then it is your duty to find the accused guilty of murder in the first degree," etc.   Held to be in accordance with the law, and no error.

7. Exceptions should be taken to the particular portions of the charge of the court deemed erroneous, in order to make them available on coming into this court, and instructions asked for should be written out, and presented to the court as provided by law.   No exception to the charge can be first taken in this court on writ of error.

8. Where the record shows that the prisoner was duly arraigned, was present at the trial and at the sentence, and no interval appears between the commencement of the trial, the verdict and the judgment, the presumption is that he was in court during the whole time.

9. This court, in passing upon questions raised by the assignment of errors, will be governed entirely by the return of the Clerk of the court below, in the record filed in compliance with the writ issued out of this court, and it will not consider other or different papers filed in the case, not belonging to such return.

Writ of Error to the Circuit Court for Franklin County. The facts of the case are stated in the opinion.

*D. S. Walker, Jr.*, for Plaintiff in Error.

*The Attorney-General* for the State.

Mr. Justice VanValkenburgh delivered the opinion of the court:

On the ninth day of May, A. D. 1882, George W. Irvin was indicted for the murder of one John Engle by shooting, in the county of Franklin. On the same day the prisoner was arraigned, and plead not guilty. By counsel, he then moved for a change of venue upon his own affidavit, which is as follows:

"THE STATE OF FLORIDA, } 
"           vs.           } Motion.
"GEORGE W. IRVIN.         }

"The defendant moves the court for a change of venue, on the following grounds, to-wit: That he does not believe that he can obtain a fair and impartial trial in the county of Franklin, on account of existing prejudice in said county against him; and furthermore, that a large portion of the citizens have formed and expressed an opinion adversely to the successful verdict for him in the said cause.

"G. W. IRVIN."

STATE OF FLORIDA, }
  County of Franklin. }

Personally came before me, J. A. Atkins, Clerk of the Circuit Court in and for said county, George W. Irvin, who being duly sworn says that the foregoing allegations .are true, to the best of his knowledge and belief.

                                   G. W. IRVIN.

Sworn to and subscribed before me this 9th day of May, 1882.                        J. A. ATKINS, Clerk.

Immediately thereafter, as appears by the record, the prisoner's counsel, upon an affidavit made by the prisoner, moved for a continuance of the case to the next succeeding term of the court, which motion for a continuance was granted.

On the 3d day of October, at a term of the court held at Apalachicola, at which the prisoner was present " in his own proper person, and also by counsel," a trial was had, and the prisoner was found guilty of murder in the first degree, The court charge the jury in the following language: " If you believe from the evidence that in the county of Franklin, State of Florida, on or about the day mentioned in the indictment, but before the day mentioned in the indictment, the deceased was sitting quietly on the deck of a steamboat, unarmed, and making no hostile demonstration, and that under the circumstances, the accused, being armed with a concealed pistol, walked up to the deceased and intending to kill him, did then and there kill him, by shooting him with the pistol aforesaid, then it is your duty to find the accused guilty of murder in the first degree, unless you also believe from the evidence that the accused was at the time aforesaid so insane that he did not know that he was doing wrong. Every man is presumed to be sane and to possess a sufficient degree of responsibility for his crimes until the contrary is satisfactorily proved ; and to

establish a defence on the ground of insanity, it must be clearly proved that at the time of committing the act the accused was laboring under such defect of reason as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know that he was doing wrong."

There was no exception reserved to any portion of this charge. The defendant's counsel asked the court to charge the jury, " that if they believed from the evidence that the alleged killing was justifiable to find a verdict of justifiable homicide." The court declined to charge the jury as requested, and the prisoner's counsel excepted to such ruling of the court.

After the verdict the counsel for the prisoner moved for a new trial as follows :

"And now comes the defendant, by M. C. Pickett, his attorney, and moves the court to grant him a new trial on the grounds that there were one, and perhaps more, of the jurors who gave the verdict of guilty of murder in the first degree against G. W. Irvin that had, previous to the trial in this cause, formed and expressed their opinion as to the guilt or innocence of the prisoner, and stated that they would hang him if they were on the jury ; thereby meaning that they would find him guilty, besides other words of like character. And for further grounds, that a large portion of the people of this county have already expressed their opinion adversely to the acquitting of said defendant." To sustain this motion the counsel for the prisoner introduced affidavits of J. W. Ramsey, Lucretia Hathcock and Virginia McLean.

Ramsey deposed that on Tuesday, the third day of October, he was present with William C. Coburn, a juror in this case, and that Coburn did, in the streets of Apalachicola,

declare that he would hang him, Irvin, every time. This was before the trial.

Lucretia Hathcock swore that on 26th September while present with Coburn, one of the jurors, in the city of Apalachicola, he said "that if he should be on the jury in said cause he would hang Irvin for the murder."

Virginia McLean swore to precisely the same facts as stated by Lucretia Hathcock.

The State's Attorney then called William Coburn, the juror, who testified that he was a juror on the trial of this cause, that he had no recollection of ever having said that defendant ought to be hung, or that he would hang him if on the jury, or to have at any time expressed an opinion as to the guilt or innocence of the defendant prior to the trial; that he was not in the city at the time of the homicide; that he had not informed himself of the circumstances of the killing, and that when he was sworn as a juror he had no existing or formed opinion as to the guilt or innocence of the accused, and was absolutely without any previously-formed opinion, and without bias or prejudice for or against the accused; that he was not sworn on his *voir dire* as to his qualifications as a juror.

The court then overruled the motion for a new trial, and the counsel duly excepted thereto, and brings his case into this court by writ of error. The errors assigned are as follows:

1st. Refusing to grant a change of venue.

2d. In refusing to instruct the jury as requested by prisoner's counsel.

3d. Refusing to grant a new trial upon the ground set out in the motion for the same.

4th. In charging the jury that "if they believed from the evidence that the deceased was sitting quietly on the deck of a steamer unarmed, and making no hostile demon-

stration, and that under these circumstances the accused, being armed with a deadly weapon, a concealed pistol, walked up to the deceased and, intending to kill him, did then and there kill him by shooting him with the pistol aforesaid, then it is your duty to find the accused guilty of murder in the first degree, unless you also believe from the evidence that the accused was at the time aforesaid so insane that.he did not know that he was doing wrong."

5th. In not charging the jury in regard as to what constituted murder in both the first and second degrees.

6th. In that the record does not show affirmatively that the prisoner was personally present in court when the judgment overruling the motion for a new trial was rendered.

H. B. Brown testified: I know the defendant, and knew John Engle. I saw him when he died. Irvin shot him just about night, and he died right where he was shot. It was on board the Chattahoochee at the dock. The shooting was in Franklin county, Florida. When Irvin shot Engle, he, Engle, was in conversation with Daniel Hathcock; they were sitting on a couple of barrels. Irvin got off of a barrel four or five feet from the one Engle was on. Before Irvin got up he took his pipe out of his pocket, drawed and filled it, lit it and began to smoke. He then got up and took from out of a bundle a pistol and passed by those two men two or three times; the last time he passed by Engle he shot him, and he fell there. It was on Monday, or about the first of the week. Shot him below the eye, on the right cheek. It was a large single-barrelled horseman's pistol. Carry a ball as big as the end of middle finger. Engle was not noticing Irvin. I knew the pistol eight or ten years. It belonged to my son-in-law, and he sold it to some one at the shop. I don't know where Irvin got the pistol. Mr. Sam Ingram came

down to the boat with Irvin. I think I saw them together fifteen or twenty minutes before the shooting. Irvin said nothing at the time of the shooting. Afterwards he walked ashore and dropped the pistol. I was in town the Friday before. Engle and Irvin were in town that day, so was Daniel Hathcock. On Friday night before I heard Hathcock and Irvin in conversation. Irvin was hunting Engle; he spoke to Hatheock and said I have been hunting that boat for Engle; I hear he is in jail. Irvin lived on Owl Creek, on Dyas place. Engle lived about a quarter or half mile from same. Irvin did not go home between Friday and Monday nights. Engle went home Friday and came back Monday. I did not see the pistol on Friday.

On his re-examination he said, when Irvin took out his pistol he put it under his arm secreted from view. He passed to and from two or three times; about five minutes from time he took out the pistol until he shot. There were no weapons about Engle, except his small barlow knife. He then identified the pistol. Irvin carried the pistol under his arm, his arms folded. I know it is the same pistol.

On his cross-examination the witness testified: Irvin and Engle had some little quarrels. They had so many I can hardly remember all. At that time there was something between them about Mr. Irvin's wife being dead. I never heard Engle make any threats against Irvin. There was some rumor between them about Irvin's wife's death. Engle said Irvin's wife told him she believed he, Irvin, had poisoned her with blue stone. I know of no facts showing that Irvin was afraid of Engle. I know of no threats made by Engle, or that he waylaid Irvin.

George Asher testified: I saw part of the matter. I saw Irvin shoot Engle on 13th March, about half hour by sun, on steamer Chattahoochee alongside of wharf at Apalach-

icola, this year. I saw Engle sitting on a barrel of oysters, and saw Irvin fire a pistol in his face. I was eight feet off. I heard no words pass between them. When shot Engle fell back and died. Was shot on right cheek. Made a big bulge on top of head. Don't know what the pistol was loaded with. It smelt like powder. It must have been powder. Something was in it. He seemed to me to die in two seconds. Irvin turned around to walk back ashore. Some men got around him and he dropped the pistol. I saw him half an hour before talking to Daniel Hathcock. I never saw the pistol before. This witness also identified the pistol.

Eugene Labatut said: I was at the gangway at midship. Irvin asked me to watch his bundle on midship, that he wanted to see Ingram. He went to Ingram. I walked off, and heard a pistol, looked back and saw Engle falling back. They said it was Irvin shot him, so I caught Irvin as he was going out. Irvin dropped his pistol, knocked it from under his arm. He tried to scrape the pistol in a hole. I told Mr. Asher to pick it up and feel if it was warm. He handed it to me, and I felt that it was warm. I said to Irvin, ain't you ashamed of what you have done? He said he had done nothing. The authorities then took him in hand. It was in Apalachicola, Florida. Engle was not drunk that I could tell. Irvin seemed to be sober. I have known him for years; he seemed as usual.

Robert Baldwin testified: I saw the killing. I was on deck, about four feet from wharf. I saw Mr. Irvin present a pistol at Engle and shoot him. Engle fell back. I heard no words or fuss between them.

The defendant offered as a witness Daniel Hathcock, who testified: I was acquainted with Engle and Irvin. They lived neighbors in Liberty county. I knew of no trouble

between them. From way they talked they did not like each other. I was here on the day of the alleged killing. They had no words in my presence. One time Engle tried to get me and Mr. Glenn to go to Irvin's and take him out and hang him. I saw Irvin here on the day of the alleged killing. Saw no fighting. I don't know of any temporary insanity in Irvin. He was not always the same. At times I would go to his house and he would hardly notice me, at other times he would seem all right. Irvin was neighbor to me, a good neighbor, as well respected as the common run. Nothing wrong about him, except like the most of the people around he would talk. I don't know that Engle wanted to shoot him. As stated, he asked me and Glenn to go to Irvin's house and hang him. Irvin and Engle were near neighbors. Engle was a very good neighbor, when drinking was very quarrelsome; when sober he would talk too much, was what you would call meddlesome. I have known Irvin twenty years, have known Engle for about four years. I never heard Engle threaten to kill Irvin if he went to arbitration. Engle told me that Irvin's wife told him that Irvin had poisoned her with blue stone; that if she died she asked him to have her examined to see if she was not poisoned. Don't know that she told any one else. Engle and his wife are the only ones that I ever heard say what Mrs. Irvin told them about her being poisoned.

On his cross-examination he said Irvin was a quiet, peaceable citizen. Know of no instance of his resorting to violence. Heard of his cutting a boy named Blanchard, don't think he was grown, and don't know the circumstances. I only heard of it; it was before the war, about 20 years ago. Glenn, Engle and myself got boards to cover a school-house, and left them in Irvin's field. Irvin set fire to his woods, and caused the boards to be burned. We

wanted Irvin to pay for them. It was submitted to arbitration. Irvin did not go to the arbitration. It was at the arbitration that Engle wanted to know if we would go to Irvin's and take him out and hang him. That was several years ago. It was the first year that Engle came there. Engle and Irvin had been much together since then. They have associated together at each other's houses. Last seven or eight years Irvin has shown peculiarities. His present manner (in court) is his ordinary manner. He would at times be reading his paper, he would look up and speak but go on reading. When so found he would continue in that humor until I left. At other times he would meet me in a friendly way, and would have a great deal to say. This was his only peculiarity. I have seen other people somewhat the same way. It might be called absent-mindedness. Engle when drunk was troublesome. He would not resort to violence that I know of; he was not dangerous, but quarrelsome when drunk. When sober he was meddlesome, fond of scandal. Irvin and Engle were very similar in that respect. But Irvin would not go about and talk. I was in town, but did not see the killing. I was sitting by the side of Engle looking him in the face when the thing happened, but did not see who shot him. I don't know that Engle knew who shot him. Engle was sober I think. I saw Irvin a short time before. I had been with him some. He was in his usual frame of mind, not drunk but talkative.

Elizabeth Russell testified substantially that she heard a difficulty between Irvin and Engle. Glenn and Hathcock hired Engle to cut timber on land Irvin had contracted for. Irvin asked him not to cut the timber on a certain part of the land. Engle said he would cut it anywhere Glenn and Hathcock told him to. Engle flew into a passion and used bad language to him. Irvin said he would prosecute him

if he did. This made Engle mad, and he used more violent language. Irvin went into the house to get a weapon to defend himself. Engle told Irvin, I will kill you yet. It was at Irvin's own door. Irvin did not come out until Engle left. When Engle left I went into Irvin's house, and he was reading a newspaper. It was September 10, 1879. I was at Mr. Fowler's on the 4th July, 1881. Irvin told me that he would have to leave the house or have a difficulty with Engle. He went into the back yard, and said if Engle interfered with him he had better not. I saw Engle going towards Irvin, and Mr. Howard Fowler stopped him, and said he would have no difficulty in his yard. I have known Irvin since I was five years old, and am now twenty-nine. He was peaceable and a good neighbor, there was no danger in him. He was afraid of Engle.

Howard Fowler says: I once told Engle on my place that if he attempted to raise any fuss with Irvin I would put him off. I told him so because he was talking about some disturbances between himself and Irvin. Engle said that Irvin's wife told him she believed Irvin had given her blue stone, and she wanted to be examined if she died. Said she told him and his wife so. Mr. Irvin was an opium-eater. Engle said he was going before the grand jury about Irvin's poisoning his wife. Irvin staid on my place nine months, and did not seem to sleep sound. Read a great deal and worked little. His sleeplessness was the only peculiarity I noticed about him.

John Glenn, for defendant, testified in substance: Sunday evening before Engle was said to be killed he was at my house, took supper with me, and proposed that we should go and get Fowler and lynch Irvin. I told him I did not believe in lynching. He proposed nothing more to me, but said that if the people did not assist him in the matter he would come to town and see what he could do

here about it. He went off. I saw him afterward, and he seemed cool, and said nothing more about lynching. Engle said Irvin's wife had told him she believed Irvin had poisoned her. Engle was not considered a quiet and peaceable citizen. He was considered to take more interest in other people's business than his own. He was considered a great tattler and creator of disturbances. Engle was more powerful physically than Irvin. On the 4th July, at night, after leaving Fowler's, Engle came to my house. On the morning of that day he and Irvin had some words about a boat of Engle's Irvin had taken. Engle asked him about it. Irvin said he thought Engle had come down to my house, and he thought there was no harm in taking the boat to come down in. He apologized to Engle for it. When he made his apologies Engle jumped up and cursed him. Irvin was cleaning his pipe with his knife. Engle did not get to him. Irvin said let us have no fuss about this thing. We quieted the disturbance. Mrs. Irvin died in Spring of 1881. I was there on the day she died, and met Engle and Irvin together, and he told me what Mrs. Irvin said about her husband's poisoning her. I don't think Irvin heard him; he is hard of hearing. On the day before he was killed Engle proposed to lynch Irvin. I did not tell Irvin. Daniel Hathcock was with me once when Engle proposed to lynch Irvin.

Lucretia Hathcock testified : Engle was very aggravating and troublesome and meddlesome. He imposed upon Mr. Irvin, and intruded on Irvin's feelings. Engle said if he was on a bear hunt and the bear and Irvin were to run out together he would let the bear go and shoot him. Heard Engle say he was going to have Irvin taken up for killing his wife. Never heard this from anyone but Engle and his family. Irvin is an opium-eater. He was a great

slave to opium. He was a good citizen and a good neighbor.

James Ramsey testified: The first trouble was at night in Irvin's yard about a child being ordered out of the yard. I saw Engle go into the house and take down a gun. Irvin did not get a gun. I asked Engle if he was going to shoot Irvin? He replied, I want to be fast enough for him. This was about four years ago.

Joseph Ramsey testified: Engle said he was going to have Irvin prosecuted for poisoning his wife. He said Irvin's wife told his wife about it. Irvin's wife was my mother. I don't think there was any truth about it, Irvin's poisoning his wife. Engle said he could whip sixteen of Irvin. He told me to tell him so, which I did. I lived in same neighborhood with Engle and Irvin all the the while. I told Irvin what Engle said about poisoning his wife and that he could whip sixteen of him. I told Irvin the latter fact about a month before I told him the other. About twenty-four hours after Engle told me about Irvin's poisoning his wife I told him about it. It was about two or three days before we got down here with a raft. Engle and myself came down on raft on Friday before killing. Irvin came down the night after. Irvin came to town while we were here. Irvin said he had heard of the rumors of the poisoning before.

—— Hosford said: Engle was not considered dangerous. He said that Mrs. Irvin told him that Irvin had poisoned her, and he did not doubt but what it was true. Irvin was considered by some to be dangerous.

William Hill said: I saw Irvin the day Engle was killed. He took dinner with me. Irvin is near-sighted. I have known him for twenty-two years. He is an opium-eater. Irvin had taken two drinks, he acted like a sober man.

Dr. B. F. Lennard testified: I hardly expect it would

render a man insane from opium. It would first have a disintegrating effect on the stomach before it would dement his mind. It might. It would stupefy him as would alcohol. I don't know what effect of drinking alcohol and eating opium. It would have a tendency to increase the soporific effect. The more opium one would eat the greater stultification would result. Opium would destroy the stomach before affecting the mind. In condition of the prisoner, as he appears, I should not regard his mental or physical condition destroyed, or so much affected as to relieve him from responsibility for his acts. Opium is seventy-five cents per ounce, may be one dollar. One ounce of opium or laudanum carried loosely loses most of its strength. Before losing his mind a man's physical appearance would so change as to attract attention.

——— Cox was recalled and testified: I never saw Irvin eating opium. It is known he did eat very heavily. He became very much excited at my house for want of it. He came to me for some. I gave him two ounces, he took it all at once. For lack of it he would become excited, but on getting a dose he would become quiet, but he never showed viciousness, but was only nervous. I know what effect opium has on people, from having seen many who use it. It prostrates their nerves.

George W. Irvin, the prisoner, after being sworn, made the following statement: I have no recollection of killing John Engle. We had lived neighbors some years before the affair happened. We had had some trouble occasionally. He imposed on me very much. I was afraid all the time that he would kill me. He threatened to kill me and threatened to hang me. After the death of my wife he said I poisoned her, and he would prosecute me for it, and in my trouble and grief for the loss of my poor wife I used more opium, it seemed to lull my trouble. On the day of

the said killing I was in this town, and after the steamboat whistled to leave I asked Engle if he had said I poisoned my wife, and that he would have me to account for it. He said yes he did, and cursed me, and said he intended to do it. I recollect nothing more until I found myself in jail next morning. I drank whiskey the day before.

The first error assigned, " in the courts refusing to grant a change of venue," cannot be sustained. The application is made upon the affidavit of the defendant, alleging " that he does not believe that he can obtain a fair and impartial trial in the county of Franklin on account of existing prejudice in said county against him," &c. He states no facts upon which he bases his conclusion that he cannot obtain a fair trial, but simply gives his belief. Such application is always addressed to the sound discretion of the court, and this court will not interfere unless they can find in the record some good reason for believing that there was not the exercise of sound discretion on the part of the Judge in refusing such change of venue. This question has been passed upon by this court and fully determined in the case of McNealy and Roulhac vs. The State, 17 Fla., 198.

But, did the court overrule the motion? The record shows that immediately after the entering of the motion for change of venue the counsel for defendant moved for a continuance of the case, for reason, to the next term of the court. This motion was upon affidavit, and was granted by the court. No order seems to have been made by the court upon the motion for change of venue, nor does it appear that the attention of the court was in any way called to it. At the subsequent term in October, to which it had been so continued, the case was called up and tried. The court's attention does not appear then to have been called to such motion, nor does it appear from the record that the

counsel for defendant made any reference to it, but without objection proceeded to the trial.

After the verdict, and on the motion for a new trial, such alleged error upon the part of the court was not made one of the grounds. The motion was clearly abandoned, and it is too late now to raise the question here. Francis vs. State, 6 Fla., 306; Burroughs vs. State, 17 Fla., 643.

The second error assigned is that the court refused to charge the jury " that if they believe from the evidence that the alleged killing was justifiable to find a verdict for justifiable homicide." The law defining justifiable homicide is contained in Chapter 1637, Laws, Sections 22 and 23, and are as follows: "Section 22. Homicide is justifiable when committed by public officers and those. acting by their command, in their aid and assistance, either in obedience to any judgment of a competent court, or when necessarily committed in overcoming actual resistance to the execution of some legal process, or the discharge of any other duty, or when necessarily committed in retaking felons who have been rescued or who have escaped, or when necessarily committed in arresting felons fleeing from justice." " Section 23. Homicide is also justifiable when committed by any person in either of the following cases : 1. When resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling-house in which such person shall be ; or 2, when committed in the lawful defence of such person, or of his or her husband, wife, parent, child, master, mistress or servant, when there shall be reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and there shall be imminent danger of such design being accomplished ; or 3, when necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in

lawfully keeping and preserving the peace." We have carefully examined the evidence brought up by the record, and fail to find any which tends to bring this case within the enumerated clauses of this law which defines justifiable homicide. There are no facts upon which to base such charge; and the court is nowhere obliged to go outside of the case as made to charge upon questions of law foreign thereto. In the case of Harris vs. the State, 34 Ala., 469, the Appellate Court says: "The court is not obliged to give in charge to the jury any and all principles of law that counsel may think proper to move, but may well refuse any that may not be applicable to the facts in evidence."

The same question has been passed upon by this court in several cases. Judge vs. Moore, 9 Fla., 269; Dibble vs. Truluck, 11 ib., 135; Whitner vs. Hamlin, 12 ib., 18; Brown vs. State, 18 ib., 472; see also Bishop on Crim. Pro., §978, and cases cited.

Tho third error assigned is, in the court's refusing to grant a new trial for the reason that a juror had previous to the trial formed and expressed an opinion as to the guilt of the prisoner, and had said that he would hang him if he was on the jury, &c. The affidavit of the defendant upon which this motion was primarily based does not contain an allegation that he was ignorant of the fact that the juror had so expressed himself at the time he was empanelled as a juror. If he was so informed he should have objected to him for cause, or exercised his right of peremptory challenge. The other affidavits made by J. W. Ramsey, Lucretia Hathcock and Virginia McLean, used upon said motion, were as to conversations with Coburn, the juror, prior to the trial, and they were all three of them witnesses for the defendant on the trial. With due diligence the defendant should have known the fact of the expression of such an opinion by Coburn, if it really existed. The affidavit of

the defendant should have unequivocally alleged that the defendant was ignorant of the fact as stated at the time of the empanelling of the jury. The State vs. Marks, 15 Nev., 33 ; Achey vs. State, 64 Ind., 56 ; 3 Am. Cr. Law, §3152, and citations, §3221.

Aside from these considerations, Coburn, by his affidavit, sets the question at rest. He has no recollection of having used the expressions as charged in the several affidavits presented by the defendant on the motion. He says he had not informed himself of the circumstances of the killing, and that when he was sworn as a juror he had no existing or formed opinion as to the guilt or innocence of the accused, and was absolutely without any previously-formed opinion, and without bias or prejudice for or against the accused. He thus shows himself qualified as a juror when he was so sworn. Dumas vs. The State, 63 Ga., 600 ; O'Conner vs. The State, 9 Fla., 215 ; Montague vs. The State, 17 Fla., 662.

The fourth error assigned is, that the court erred in its charge to the jury, as is fully set out above ; and that it should also have instructed them as to what constituted murder in both the first and second degrees. No exception was reserved to the charge or any portion of it, and by the decisions of this court, often repeated, no exception thereto can be first taken here on writ of error. The attention of the court below should have been called to the error alleged at the time, and the instructions asked for should have been written out as provided by the laws, and presented to the Judge, who would " have declared in writing his ruling thereupon, as presented, and pronounced the same to the jury as given or refused." The charge, however, is in conformity to the law. The question was disposed of in Savage and James vs. The State, 18 Fla., 909, and in the charge the court used the language of that decision.

In reference to the charge then before this court, it says: "We find language not strictly correct in this ; the words, 'and intentionally shoot Paterson, killing him,' should under our statute read thus, 'and shoot Paterson, *intending to kill and did kill him,*' &c. This is obvious, because the law makes the premeditated *intent to kill* necessary to constitute murder in the first degree."

The proof shows that the deceased and Daniel Hathcock were sitting on barrels talking together, that Irvin got off from another barrel four or five feet from the one Engle was on. That before he got up he took his pipe out of his pocket, cleaned, filled and lit it and began to smoke. He then got up and took from out a bundle a pistol, and passed by the two men two or three times. The last time he passed by Engle he shot and killed him. That he shot him below the eye on the right cheek ; that the pistol was a large single-barreled horseman's pistol. That Engle was not noticing Irvin when he was shot. There evidently was time for deliberation and to form the intent to take the life of Engle, and the jury who are the judges of the facts, among which is the question of premeditation, have by their verdict determined the deliberation, intent, premeditation and execution.

The fifth error assigned is, that the record does not show affirmatively that the prisoner was present when the judgment overruling the motion for new trial was rendered.

The rule is well settled in this State that the prisoner has a right to be, and must be, present during the trial of a capital case; that no steps can be taken by the court in the trial of the cause in his absence. Holton vs. The State, 2 Fla., 500 ; Gladden vs. The State, 12 Fla., 562. In both of these cases the record showed upon its face that certain proceedings were had in the absence of the prisoner. In this case the record shows no such fact, but on the contrary,

the presumptions are that prisoner was present during the entire proceedings. The record shows that on the 9th day day of May, 1882, the prisoner was brought to the bar of the court, and being arraigned in due form plead not guilty. That on 3d day of October, 1882, on which day the trial was had, "came the said plaintiff aforesaid, ' The State of Florida,' and the said defendant, George W. Irvin, in his own proper person, and also came their respective attorneys; and the prisoner, George W. Irvin, was led to the bar of the court by the sheriff," &c. The record shows no adjournment of the court. Immediately upon the verdict being rendered, counsel for the prisoner moved for a new trial, which was denied by the court, "whereupon the court aforesaid on the —— day of October, 1882, at the term aforesaid, did pronounce sentence of death upon said defendant." It also appears by the record that the prisoner was present at the time sentence was so pronounced, and was asked if he had anything to say before such sentence.

In the case of Jeffries vs. The Commonwealth, 12 Allen, 145, the court in commenting upon this question, says: " Nor is it necessary that the record should in direct terms state that the party was personally present at the time of the rendition of the verdict, and during all the previous proceedings of the trial. However necessary it may be that such should have been the fact, it is not necessary to recite it in the record. The record shows that he was present at the arraignment, and present to receive his sentence."

This record states all that is necessary to warrant the inference that the prisoner was present when the motion for a new trial was denied. Stephens vs. The People, 19 N. Y., 549 ; Schirmer vs. The State, 33 Ill., 276 ; Rhodes vs. The State, 23 Ind., 24 ; State vs. Wood, 17 Iowa, 18 ; Griffin vs. State, 34 Ohio St., 299.

Judgment affirmed.

The plaintiff in error then filed a petition asking for re-hearing.

MR. JUSTICE VANVALKENBURGH delivered the following opinion thereon:

A petition for rehearing was filed in this case. The petitioner states that one ground relied upon for the purpose of securing a new trial was, that the record does not show affirmatively that the prisoner was personally present when the judgment overruling the motion for a new trial was rendered. He further says that a record of proceedings of the cause filed on the 2d day of November, 1882, states that upon the rendition of the verdict the prisoner was remanded, and that neither it nor the other copy of said proceedings show that the prisoner was again in court until he was led to the bar to be sentenced; that the two copies of the record were filed, one on the 2d day of November, and the second on the 4th day of January following.

There is but one record in this case upon which this court can act. The writ of error was issued, as appears by the writ, on the second day of November, A. D. 1882, and was served upon the clerk of Franklin county on the 8th day of November. The clerk's certificate to the return, made in compliance with the requirements of such writ, is dated on the 29th day of December, 1882, and was filed in this court on the 4th day of January, 1883. This return, made in compliance with the order of this court, is the only record of which it can take notice, and it was in reference to that alone that the opinion is based upon. Had the record been defective in any respect the counsel could have had it corrected under the rules of the court. It nowhere in the record appears that the prisoner was at any time out of

the presence of the court, but from it the presumption is that he was in court during all of the proceedings. The counsel cites the 2d and 12th Florida. In both of these cases the *record shows* that the prisoner was absent during proceedings had upon the trial. In the first, Holton vs. The State, the court, in the statement of the case, says "It also appears from the record that after the jury had retired the Judge gave instructions to the sheriff that if the jury did not agree in one hour to adjourn the court until next morning. Between 11 and 12 o'clock at night the jury sent to the Judge, by the bailiff, for his charge. The clerk was directed to make out a copy, which was done, and the foregoing charge, not sealed or certified, with the exception of the words, ' or accident,' was sent to them, without the consent of the prisoner or his counsel." In the second case, Gladden vs. the State, this court says (after stating that several grounds of error, other than those disposed of, had been assigned,): " We will consider but one of them, which was the absence of the prisoner from the court, for some minutes, three several times during the progress of the trial, at one time when one of the State witnesses was being examined, at another when a witness, for the defence was being examined, and a third time during the argument of counsel. The absence was voluntary, bnt without any express waiver of his right to be present." * * * * "This court has laid down the rule very broadly, and has, perhaps, extended it beyond the views of the courts of some other States," and then cites Holton vs. State, *supra*, deciding the question. We think the rule should be extended no further, and it is questionable, with reference to the authorities, whether the presence of the prisoner is necessary during a motion for a new trial. This question, however, is not here, and we do not therefore propose to decide it. See Jewell vs. Commonwealth, 22 Pa.

St., 94 ; 1 Bish. Cr. Pr., §277.   In the case of Griffin vs. The State, 34 Ohio St., 299, the court say : " There is no doubt that the prisoner had a constitutional right to appear in court at his trial, and defend in person and by counsel, and to meet the witnesses face to face, before an impartial jury.   But it is doubtful whether it is necessary for the defendant to be present in court during the agitation of questions of law, between the rendition of the verdict and sentence," and cites 3 Am. Cr. Law, §2998.

The whole record before the court must be taken with its reasonable intendments, and in view of it in all its parts we must deny the petition for rehearing.